A09A1947. EDMONDS v. BOARD OF REGENTS OF THE
UNIVERSITY SYSTEM OF GEORGIA et al.

(689 SE2d 352)

BLACKBURN, Presiding Judge.

After he was indefinitely suspended from his employment as an Assistant Professor of Microbiology at Georgia Institute of Technology ("Georgia Tech"), Paul Edmonds brought suit against Georgia Tech and the Board of Regents of the University System of Georgia ("Board of Regents"). Edmonds also sued G. Wayne Clough (Georgia Tech President), Gary B. Schuster (Georgia Tech Provost and Vice-President for Academic Affairs), E. Kent Barefield (Interim Dean of the College of Sciences at Georgia Tech), and John McDonald (Chairman of the Georgia Tech School of Biology), asserting claims against these men in both their individual and their official capacities. Edmonds's complaint asserted claims for: (i) violations of Georgia's Whistleblower Act (OCGA § 45-1-4 (d) (2)); (ii) tortious interference with his contractual business relations with third parties; (iii) breach of his employment contract; (iv) violation of his free speech rights; and (v) violation of his right to procedural due process. The complaint sought compensatory damages, as well as various forms of injunctive and declaratory relief, including the reinstatement of Edmonds's employment and the restoration of his access to his office and laboratory space at Georgia Tech.

After the appellees moved for summary judgment on all counts, Edmonds voluntarily dismissed his claims against President Clough and Dean Schuster, in their individual capacities, and his free speech claim. The trial court subsequently granted summary judgment in favor of the appellees and against Edmonds's on all of his remaining

claims and Edmonds now appeals from that order. Finding that the trial court properly concluded that the appellees were entitled to judgment as a matter of law on each of Edmonds's claims, we affirm.

On a "motion for summary judgment, it is the movant's burden to show that no jury question remains as to any material fact and that he or she is entitled to judgment as a matter of law." (Punctuation omitted.) *Partain v. Oconee County*.[1]

> To obtain summary judgment, a defendant need not produce any evidence, but must only point to an absence of evidence supporting at least one essential element of the plaintiff's claim. Our review of a grant of summary judgment is de novo, and we view the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmovant.

*Jones v. Bd. of Regents of the Univ. System of Ga.*[2]

So viewed, the record shows that Edmonds was employed at Georgia Tech from 1985 until October 2006. Every year between August 1985 and August 2005, Edmonds entered into an annual employment contract with the Board of Regents, with each contract running from August until May of the following year. Edmonds's last employment contract covered the period of August 15, 2005 through May 15, 2006.

Although Georgia Tech administrators expressed concerns about Edmonds's performance as early as 1987, he nevertheless received tenure in 1991. Edmonds, however, received no further promotions — i.e., he was never promoted beyond the position of associate professor.

Between approximately 1996 and 2002, Edmonds made a number of complaints to Georgia Tech administrators. Specifically, in 1996 Edmonds complained when Georgia Tech changed the method by which membership on faculty committees was decided, moving from a system where faculty elected the committee members to a system where all committee members were appointed by an administrator. In or around the same time period, Edmonds also expressed some concerns about the way the university was handling diversity training and racial issues. Finally, in 1999, Edmonds complained to Dean Schuster and President Clough after he was assigned what he believed to be an unprecedented teaching load. According to Edmonds, he voiced concerns both about the work requirements being

---

[1] *Partain v. Oconee County*, 293 Ga. App. 320 (667 SE2d 132) (2008).

[2] *Jones v. Bd. of Regents of the Univ. System of Ga.*, 262 Ga. App. 75, 76 (585 SE2d 138) (2003).

placed on him as well as certain safety concerns he had.

Edmonds's safety concerns resulted from the fact that, in conjunction with his lectures, the university had scheduled groups of students to perform their laboratory work during "back to back" time frames, meaning there would not be adequate time to clean the labs between classes. As Edmonds acknowledged in his deposition, the teaching schedule in 1999 was somewhat different from any year before or since, because that was the year Georgia Tech was transitioning from a quarter system to a semester system. There is no evidence that, after 1999, Edmonds was ever again assigned a teaching schedule he claimed was unreasonable or unusual. Nor is there any evidence that Edmonds raised any safety concerns regarding the Georgia Tech laboratories after the 1999 academic year.

During Edmonds's employment at Georgia Tech, the Board of Regents promulgated a policy requiring all tenured professors in the state university system to undergo periodic, post-tenure reviews. At Georgia Tech, such reviews are conducted by an appointed Periodic Peer Review Committee ("PPR Committee"). The PPR Committee reviews documentation provided by both the faculty member under review and the relevant Department Chair, as well as teaching evaluation forms completed by the faculty member's students. The PPR Committee then makes a written report to the university president regarding the faculty member's research, scholarship, and teaching. The PPR Committee also recommends whether the faculty member should be reviewed again in three years or in five years, with a recommendation for a three-year review indicating that the PPR Committee believes there is a problem with the faculty member's performance in one or more areas.

Edmonds underwent his first post-tenure review in 2002, with the PPR Committee finding that teaching was:

> an area in which Dr. Edmonds has both the ability and the need for considerable improvement. Consequently, we recommend that he be reviewed again in 3 (three) years. A satisfactory review at that time would require more consistent scholarly activity, i.e., publication and consistent teaching evaluations that are at least in the normal range for the School of Biology. Given the inconsistent record, we recommend that Dr. Edmonds seek help [from peers] and that the school provide peer review of his teaching.

As a result of this evaluation, Dean Schuster asked the professor serving as the School of Biology's Director of Teaching Effectiveness ("DOTE") to review Edmonds's teaching. The DOTE assembled a faculty committee to review Edmonds's teaching performance; this

YALE LAW LIBRARY

4

committee consisted of three professors, two of whom had been approved by Edmonds. Following the DOTE evaluation, Edmonds requested and received the spring 2003 semester off from teaching, with the understanding that he would use that time to revise and update the syllabus for his undergraduate microbiology class and to develop slides or other visual aids to be used in his lectures.

In response to both the post-tenure review and the DOTE review of his teaching, Edmonds filed a grievance with the Faculty Status and Grievance Committee in December 2002, in which he alleged: (1) that he had received inequitable teaching assignments that adversely affected his teaching performance; (2) that his post-tenure review had been unfair and incomplete, because the PPR Committee had failed to take into account positive student comments he received; and (3) that the Biology School Chairman had interfered with his ability to recruit and train graduate students. These allegations were investigated by a specially appointed subcommittee, which found that Edmonds's claims had no merit and which issued a written report detailing the factual findings that supported this conclusion.

Edmonds underwent a second post-tenure review in 2005, performed by a different PPR Committee. This PPR Committee also recommended that Edmonds be reviewed again in three years, "[d]ue to the continuing concerns about research productivity and teaching effectiveness." Following this review, Schuster initiated dismissal proceedings against Edmonds pursuant to the procedure outlined in the Georgia Tech Faculty Handbook.[3] The grounds for dismissal were "professional incompetence and neglect of duty in teaching, research, and scholarship." As part of the dismissal proceedings, Edmonds requested and received a hearing before a Faculty Hearing Committee. Edmonds was represented by counsel at that hearing and had the opportunity to present documentary evidence, testify on his own behalf, present witnesses on his own behalf, and cross-examine the witnesses called by Georgia Tech. The Faculty Hearing Committee issued a written report, dated September 19, 2006, in which it found that Georgia Tech had failed to prove by a preponderance of the evidence that Edmonds was incompetent in the areas of scholarship and research, but that it had proved Edmonds's incompetence in the area of teaching. The report recommended that Edmonds be placed "on suspension without pay for a minimum of one full contract year," and that he "work on developing

---

[3] Section 3.7.3.5 of the Faculty Handbook provides that the university may initiate dismissal proceedings against a tenured professor who "is judged to have had major and chronic deficiencies (3 year review decision) and has not made significant progress towards remedying the deficiencies identified in previous reviews."

a remediation plan with the School of Biology and the Dean of the College of Sciences to address the deficiencies in his teaching." The report further recommended that if the parties could not agree on a remediation plan, Edmonds's suspension without pay be made indefinite.

In January 2007, Edmonds met with Dean Schuster and Roger Wartell, the then-Chair of the Biology Department, and agreed to a three-part remediation plan. That plan required Edmonds to: (1) enroll in an undergraduate microbiology class at Georgia State University ("GSU"), either as one who was auditing the class or as a student taking the class for credit; (2) prepare a new syllabus for the undergraduate microbiology course he taught at Georgia Tech; and (3) prepare and present a series of nine lectures to a faculty committee at Georgia Tech. Edmonds attended the first three classes of the microbiology course at GSU, but quit going after the professor told him that he had to register for the class in order to access the online class materials. Edmonds refused to register for the class because he felt that enrolling in an undergraduate course would somehow impact his faculty status at Georgia Tech. Thus Edmonds, by his own admission, never fulfilled even the first requirement of the remediation plan.

On February 14, 2007, Clough sent Edmonds a letter stating:

> To date, you have not demonstrated that you have registered for the [microbiology] course [at GSU] — either to audit the class or to take it for credit — and therefore you have failed to meet the terms of the agreement reached in January. You have not responded to inquiries from Dr. McDonald regarding your 'status at Georgia State. If you have in fact registered for the course, please provide evidence of your registration . . . no later than the close of business on February 21, 2007; otherwise you will be suspended without pay indefinitely, effective on that date. . . .
>
> If you are placed on indefinite suspension, there is no expectation that you will return to work in the near future; therefore, your office and laboratory space will no longer be reserved for you. Furthermore, your Georgia Tech telephone number will be disconnected, and your computer account and email will be cancelled.

Edmonds never responded to that letter and never made any effort to remove his belongings from his office or his laboratory space, because he did not believe that the administration had the authority to remove him from those premises. He lost access to both

his office and his laboratory space when Georgia Tech changed the locks, although he was given the opportunity to later pick up his belongings that had been stored there.

On appeal, Edmonds asserts that the trial court erred in granting summary judgment against him because there exist triable issues of fact as to each of his claims. For the reasons explained below, we disagree.

1. Edmonds's first cause of action alleged a violation of Georgia's Whistleblower Act which provides, in relevant part:

> No public employer shall retaliate against a public employee for disclosing a violation of or noncompliance with a law, rule, or regulation to either a supervisor or a government agency, unless the disclosure was made with knowledge that the disclosure was false or with reckless disregard for its truth or falsity.

OCGA § 45-1-4 (d) (2). Subsection (e) (1) of this statute affords any public employee who has been retaliated against the right to bring a civil action "for relief as set forth [in subsection (e) (2)[4]] within one year after discovering the retaliation or within three years after the retaliation, whichever is earlier." OCGA § 45-1-4 (e) (1).

In his brief, Edmonds asserts that his poor post-tenure evaluations in 2002 and 2005 and his eventual indefinite suspension from his employment in 2006 were done in retaliation for the laboratory safety concerns he voiced in 1999. Assuming arguendo that Edmonds's assertions have any merit, they are insufficient to state a claim under the Whistleblower Act. As noted above, that statute bars retaliation for an employee's disclosure of "a violation of or noncompliance with *a law, rule, or regulation*." (Emphasis supplied.) "Law, rule, or regulation," in turn, are expressly defined as "includ[ing] any federal, state, or local statute or ordinance or any rule or regulation adopted according to any federal, state, or local statute or ordinance." OCGA § 45-1-4 (a) (2). Here, there is no evidence that Edmonds complained that Georgia Tech was violating one or more laws, rules, or regulations, as those terms are defined in the statute. Specifically, neither Edmonds's complaint, his pleadings in the trial court, nor his appellate brief cite to a "law, rule, or regulation" that Georgia Tech's 1999 laboratory schedule allegedly violated. Rather, the record shows only that Edmonds raised "safety concerns," including the possibility that, under the 1999 laboratory schedule,

---

[4] Under OCGA § 45-1-4 (e) (2), such relief may include injunctive relief, reinstatement of the employee to the position he held prior to the retaliation, reinstatement of the employee's fringe benefits and seniority rights, and compensatory damages.

the University would be unable to adhere to accepted "biosafety rules." Accordingly, the trial court did not err in finding that the appellees were entitled to judgment as a matter of law on this claim. See *Ellison v. Burger King Corp.*[5] (once the movant on a motion for summary judgment has established that "there is an absence of evidence to support the nonmoving party's case . . . the nonmoving party cannot rest on its pleadings, but rather must point to specific evidence giving rise to a triable issue").

2. Edmonds's claim for tortious interference with contractual relations was based on his allegation that by denying him access to his laboratory after February 21, 2007, the appellees interfered with research agreements Edmonds had with third parties. Assuming that Edmonds could prove the existence of such contracts,[6] however, the Georgia Tort Claims Act ("GTCA") bars him from asserting the tortious interference claim.

With respect to the individual appellees, the GTCA provides immunity to state employees for liability "arising from the performance or nonperformance of their official duties or functions." OCGA § 50-21-21 (b). And, as Edmonds concedes in his brief, the individual appellees were performing their official duties when, following Edmonds's indefinite suspension, they had the locks changed on Edmonds's office and laboratory space.

With respect to the remaining appellees, Edmonds points out that the GTCA waives the sovereign immunity of the state for the torts of state officers and employees "while acting within the scope of their official duties or employment." OCGA § 50-21-23 (a). That waiver of immunity, however, is subject to 13 exceptions set forth in OCGA § 50-21-24. Under the exception set forth in OCGA § 50-21-24 (7), the state has no liability for losses resulting from, among other things, interference with contractual rights. See *Hardin v. Phillips.*[7] ("The GTCA specifically provides that the state shall have no liability for losses resulting from interference with contractual relations.") Accordingly, the trial court correctly found that Edmonds's tortious interference claim was barred by the GTCA.

Edmonds attempts to avoid this result by arguing that his claim can be viewed as one for tortious interference with business relations, as opposed to tortious interference with a contract. Viewed in this light, he reasons, the statutory immunity does not apply. This Court, however, has previously considered the argument that the

[5] *Ellison v. Burger King Corp.*, 294 Ga. App. 814, 819 (3) (a) (670 SE2d 469) (2008).

[6] In his deposition, Edmonds acknowledged that he did not have any research contracts in 2006; rather, he claimed that the appellees' conduct interfered with his ability to procure such contracts.

[7] *Hardin v. Phillips*, 249 Ga. App. 541, 545 (2) (547 SE2d 565) (2001).

YALE LAW LIBRARY

term contractual relations "does not include 'interference with business relations' [and found it to be] meritless." *Hardin*, supra, 249 Ga. App. at 545 (2). "[T]he elements of interference with business relations and interference with contractual relations are the same." Id.

Edmonds further argues that the trial court erred in granting summary judgment to Clough and McDonald, in their individual capacities, because he presented evidence that these two appellees acted intentionally and maliciously in locking him out of his office and laboratory. In support of this argument, Edmonds cites to cases applying and interpreting Article I, Section II, Paragraph IX (d) of the Georgia Constitution of 1983, which provides:

> *Except as specifically provided by the General Assembly in a State Tort Claims Act*, all officers and employees of the state or its departments and agencies may be subject to suit and may be liable for injuries and damages caused by the negligent performance of, or negligent failure to perform, their ministerial functions and may be liable for injuries and damages if they act with actual malice or with actual intent to cause injury in the performance of their official functions.

(Emphasis supplied.)

> This [language], however, which makes state officials and employees liable for official functions performed with actual malice or intent to cause harm, *does not apply to cases involving state employees that are protected by the GTCA*. In fact, on its face, the amendment specifically excepts those cases governed by the GTCA.

(Emphasis supplied.) *Hardin*, supra, 249 Ga. App. at 544 (1). Thus, "[b]oth the provisions of the GTCA and the case law interpreting it demonstrate that the Act provides immunity from liability for torts committed during a state employee's performance of official duties without regard to intent or malice." (Punctuation omitted.) *Ford v. Caffrey*.[8] See also *Tootle v. Cartee*[9] ("GTCA immunity is not abrogated by allegations that the state employee's actions were ill-intentioned or motivated by malice"). Accordingly, "despite allegations that their actions were motivated by malice and ill-intent," the trial court correctly concluded that the individual appellees "[were]

---

[8] *Ford v. Caffrey*, 293 Ga. App. 269, 273 (2) (a) (666 SE2d 623) (2008).
[9] *Tootle v. Cartee*, 280 Ga. App. 428, 431 (634 SE2d 90) (2006).

entitled to immunity under the GTCA." *Hardin*, supra, 249 Ga. App. at 545 (1).

3. Edmonds's breach of contract claim is based on his assertion that, despite being suspended from his employment, he nevertheless remained an employee of the Board of Regents, because he had not been fired. He therefore argues that because his written employment contract required the Board of Regents to provide him with health insurance and retirement benefits, the Board of Regents breached that contract when, following his suspension from employment in October 2006, it ceased paying his health insurance premiums and retirement contributions. What Edmonds's brief refuses to acknowledge or address, however, is the fact that his last written contract with the Board of Regents ended in May 2006. Even though Edmonds may have continued to work after that point (teaching a class from August to October 2006), he cites to no evidence or legal authority to support his implicit argument that this employment was subject to the terms of his previous written contract. In other words, Edmonds failed to show the existence of a current, written contract.

Furthermore, assuming arguendo that Edmonds could prove his continued employment with the Board of Regents was subject to the terms of his 2005-2006 contract, he cannot prove a breach of that contract. Edmonds's written employment contract was, by its terms, subject to the written policies of both the Board of Regents and the State Teachers Retirement System ("TRS"). Under the written policies of both the Board of Regents and the TRS, an individual must be working at least one-half time (i.e., at least 20 hours a week) to be eligible for health and retirement benefits. Edmonds acknowledged that, following his indefinite suspension, he was not working in any capacity at Georgia Tech. The terms of his employment contract, therefore, prevented him from receiving health insurance or retirement benefits, and the trial court correctly concluded that Edmonds could not establish a breach of contract claim.

4. Edmonds's complaint asserted a claim for "breach of administrative policy," which the trial court treated as a claim for violation of Edmonds's procedural due process rights. On appeal, Edmonds contends that this count asserted a claim for violations of his constitutional rights both to equal protection and to procedural due process. Edmonds, however, has pointed to no evidence sufficient to allow either an equal protection or a due process claim to go to a jury.

(a) *Equal Protection.* "Under the equal protection clauses of the United States and Georgia Constitutions, the government is required to treat similarly situated individuals in a similar manner."

YALE LAW LIBRARY

(Punctuation omitted.) *Morgan County Bd. of Commrs. v. Mealor*.[10]

> The person who is asserting the equal protection claim has the burden to establish that he is similarly situated to members of the class who are treated differently from him. If the person asserting the violation cannot make the foregoing showing, there is no need to continue with an equal protection analysis.

(Punctuation omitted.) *Employees' Retirement System of Ga. v. Melton*.[11] Edmonds has failed to meet this initial burden.

Edmonds's equal protection claim is based on his assertion that there were other professors at Georgia Tech who had poorer evaluations than he, who had procured less research funding than he, and who had produced less scholarship than he. Despite these deficiencies, such professors, unlike Edmonds, were not subject to consecutive three-year post-tenure reviews or to termination proceedings. Edmonds, however, points to no evidence which supports these assertions — i.e., he neither identifies any such professors nor shows how their performance in the foregoing areas was, in fact, poorer than (or even as equally poor as) his own. More importantly, Edmonds does not claim that any of these unnamed professors was found — as Edmonds was — to be deficient in all three areas. Thus, Edmonds has failed to assert that any of these professors was, in fact, similarly situated to him and he therefore cannot establish a violation of his right to equal protection. See *Sykes v. City of Atlanta*[12] (summary judgment in favor of defendant-employer affirmed where employee failed to provide any evidence specifically identifying similarly situated employees who were treated differently than she); *Ferros v. Ga. State Patrol*[13] (summary judgment in favor of defendant-employer affirmed where employees failed to show that they were, in fact, similarly situated to an employee they claimed received preferential treatment).

(b) *Due Process*.

> Neither the federal nor the state constitution's due process right guarantees a particular form or method of procedure, but is satisfied if a party has reasonable notice and opportunity to be heard, and to present its claim or defense, due

---

[10] *Morgan County Bd. of Commrs. v. Mealor*, 280 Ga. 241, 243 (2) (626 SE2d 79) (2006).

[11] *Employees' Retirement System of Ga. v. Melton*, 294 Ga. App. 634, 642 (3) (669 SE2d 692) (2008).

[12] *Sykes v. City of Atlanta*, 235 Ga. App. 345, 348 (5) (a) (509 SE2d 395) (1998).

[13] *Ferros v. Ga. State Patrol*, 211 Ga. App. 50, 53 (4) (b) (438 SE2d 163) (1993).

regard being had to the nature of the proceeding and the character of the rights which may be affected by it.

*Solinet v. Johnson*.[14] "The focus of the procedural due process analysis is whether the state makes adequate procedures available — not whether the plaintiff takes advantage of those procedures and achieves a successful outcome." (Punctuation omitted.) *Camden County v. Haddock*.[15] Here, the burden was on Edmonds to show that a question of fact existed as to whether the Board of Regents provided him with an adequate hearing. See *Bd. of Commrs. of Effingham County v. Farmer*.[16] Edmonds failed to meet this burden.

Edmonds asserted that he was deprived of procedural due process because he "was denied the opportunity to present all of the evidence of his exemplary service [to the university] and witnesses who could attest to his excellent performance at the post [tenure] review [PPR] proceedings." The record belies this assertion. Specifically, the record shows that Edmonds's PPR Committees were each given all the information that Edmonds provided for that purpose. Additionally, Roger Wartell, the Biology Department Chairman at the time of Edmonds's 2002 PPR review, testified that he gave to the PPR Committee student letters praising Edmonds, after Edmonds provided the same to him. And, in its written report, the 2005 PPR Committee specifically acknowledged the student testimonials provided by Edmonds.

Moreover, "[p]rocedural due process may be satisfied by a subsequent remedial proceeding where notice and an opportunity to be heard are afforded." *In re July-August, 2003 DeKalb County Grand Jury*.[17] Thus, pretermitting whether Edmonds was treated fairly with respect to his post-tenure reviews, he was given a two-day hearing in advance of his suspension — the suspension which he alleges resulted from the unfair post-tenure evaluation process. As Edmonds himself testified, he did not believe there was anything unfair about the hearing process itself; he just disagreed with the outcome. "However, the Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill advised personnel decisions." (Punctuation omitted.) *Shaw v. Oconee County*.[18] See also *Farmer*, supra, 228 Ga. App. at 822 (1).

Most importantly, the evidence establishes that the hearing did

---

[14] *Solinet v. Johnson*, 280 Ga. App. 227, 230 (633 SE2d 626) (2006).

[15] *Camden County v. Haddock*, 271 Ga. 664, 665 (1) (523 SE2d 291) (1999).

[16] *Bd. of Commrs. of Effingham County v. Farmer*, 228 Ga. App. 819, 822 (1) (493 SE2d 21) (1997).

[17] *In re July-August, 2003 DeKalb County Grand Jury*, 265 Ga. App. 870, 872 (2) (595 SE2d 674) (2004).

[18] *Shaw v. Oconee County*, 863 FSupp. 1578, 1581 (I) (B) (M.D. Ga. 1994).

provide Edmonds with the requisite due process — i.e., notice and an opportunity to be heard. Edmonds was represented by counsel at the hearing, and he was given the opportunity to present documentary evidence and witnesses, testify in his own behalf, and cross-examine the witnesses for Georgia Tech. This hearing satisfied Edmonds's right to procedural due process both with respect to his post-tenure reviews and with respect to Georgia Tech's decision to suspend him from employment.[19] *Camden County*, supra, 271 Ga. at 665 (1); *Solinet*, supra, 280 Ga. App. at 230.

For the reasons set forth above, we affirm the trial court's order granting summary judgment in favor of the appellees.

*Judgment affirmed. Adams and Doyle, JJ., concur.*

DECIDED DECEMBER 21, 2009 —
RECONSIDERATION DENIED JANUARY 12, 2010 — ■■■■■■■

*Jacqueline K. Taylor*, for appellant.

*Thurbert E. Baker, Attorney General, Romy D. Smith, Assistant Attorney General*, for appellee.

---

[19] That this hearing afforded Edmonds an opportunity to be heard is best demonstrated by the fact that Edmonds achieved a partially successful outcome. The Faculty Hearing Committee concluded that Georgia Tech had failed to meet its burden of proof on the accusation that Edmonds was incompetent in the areas of scholarship and research and therefore refused to strip him of tenure.