A10A1992. FORRESTER et al. v. GEORGIA DEPARTMENT OF HUMAN SERVICES.
(708 SE2d 660)

DILLARD, Judge.

Tonya Forrester, Phyllis Charnley, and Stefanie Phillips brought suit against the Georgia Department of Human Services ("DHS") following their termination from the Dawson County Department of Family and Children Services ("DFCS"), claiming that they were dismissed for reporting the unlawful conduct of another employee in violation of Georgia's whistle-blower statute.[1] DHS was granted

---

[1] OCGA § 45-1-4 (d) (2) prohibits public employers from retaliating "against a public employee for disclosing a violation of or noncompliance with a law, rule, or regulation to either a supervisor or a government agency, unless the disclosure was made with knowledge that the disclosure was false or with reckless disregard for its truth or falsity."

summary judgment on these claims, which Forrester, Charnley, and Phillips now appeal. For the reasons noted infra, we affirm the trial court's grant of summary judgment in favor of DHS.

Viewed in the light most favorable to the nonmovant appellants,[2] the record shows that Forrester, Charnley, and Phillips (collectively "appellants") were employees at Dawson County DFCS, and that Forrester supervised Charnley and Phillips. During their tenure with DFCS, the appellants became friends, and Forrester even vacationed with Charnley on one occasion. This otherwise positive work environment, however, was hampered by the troubling behavior of Forrester's co-supervisor, Samantha Delong.

Delong was a longtime employee of DFCS who, for one reason or another, was chronically absent from the office. Beginning in 2005, Forrester complained to Dawson County DFCS Director Amanda Morgan about Delong's many absences, "venting [her] frustrations" about having to do the job of two people and speculating that Delong was someone who "doctor shopped" for prescription pain medication. And when Morgan left to become a DFCS regional director in 2006, Forrester approached the new director of Dawson DFCS, Dorothy Gore, about Delong's chronic absenteeism and alleged "doctor shopping" for pain medication. After Gore left Dawson DFCS in 2007 (after being placed on administrative leave during the investigation discussed infra), Jill Rice became the interim director. And while a new interim director provided Forrester with yet another opportunity to vent about Delong, Forrester claims that she never had a "formal" conversation with Rice about Delong because, according to Forrester, Rice was already well aware of Delong's problems (having previously supervised Delong in another county). Nevertheless, in June 2007, Forrester did contact Rice to inform her that (1) Delong was intoxicated at work; (2) the employees were concerned she might drive while impaired; and (3) on the few occasions when Delong *did* come to work, she generally did so while under the influence of prescription drugs. In response to Forrester's concerns, Rice took action against Delong by personally keeping up with her use of leave and, eventually, depleting it when necessary. But the revolving door continued at Dawson, and in October 2007, Rice left the office and John Wilson became the next interim director. In Forrester's own words, she thereafter began "venting" to Wilson about Delong's disturbing conduct. And throughout this entire time period, while Forrester was complaining to her superiors, Charnley and Phillips were making similar complaints to her about Delong's on-the-job actions/inactions.

---

[2] *See, e.g., Furlong v. Dyal*, 246 Ga. App. 122, 123 (1) (539 SE2d 836) (2000).

In the early summer of 2007, while appellants were raising their concerns about Delong, allegations arose that then-Dawson Director Gore forced DFCS clients to use a friend's counseling service, which then triggered an investigation by the Office of Investigative Services ("OIS").[3] Judy Blackwell was assigned to handle the Gore investigation by OIS, and during the course of this investigation she was advised of issues that certain employees had with Delong, Forrester, Charnley, and Phillips.[4] Specifically, these employees accused the appellants of, inter alia, not working the required number of hours; getting their hair done and going tanning during work hours without taking leave; taking overly long lunches and arriving late without reflecting same on their time sheets; and not making required home visits. In response to these complaints, Blackwell outlined the employees' concerns in a letter to the main DFCS director.

In what was a routine practice when employee misconduct is alleged, DFCS management requested that OIS investigate Delong and the appellants after examining Blackwell's letter. Blackwell was thereafter assigned this investigation in September 2007 and was directed to further look into the allegations of abused leave time by Delong and the appellants.[5] Blackwell's investigation began on October 1, 2007, and she advised Delong and the appellants shortly thereafter that she was looking into an alleged misuse of funds and abuse of the agency's leave policy.

Throughout the course of Blackwell's investigation, the three employees who had expressed their concerns to Blackwell maintained logs of Delong and appellants' activities at work, including the time of their arrival and departure, which the employees then provided to Blackwell. One of these employees was Don Hamil. Hamil, like Charnley and Phillips, was supervised by Forrester, and he became suspicious of Delong and the appellants after inadvertently stumbling upon some of their time sheets on Forrester's office floor, examining them, and realizing that the time reflected on those sheets was inaccurate. Hamil thereafter began documenting appellants' various and sundry workplace activities, noting instances when they (1) scheduled lengthy hair appointments during office hours; (2) told co-workers they were going shopping but then indi-

---

[3] OIS is part of DHS, but it is a separate and distinct agency under the DHS umbrella. In a nutshell, OIS is responsible for maintaining the integrity of DHS programs by investigating allegations of employee misconduct.

[4] An employee who provided a considerable amount of information about the appellants stated that he was mainly concerned about the lack of accountability in the Dawson County DFCS office in the absence of a full-time director.

[5] The OIS investigation of Forrester, Charnley, Phillips, and Delong was considered complex because it involved multiple employees.

cated on a sign-out board that they were on a DFCS-related errand; (3) played games on a work computer; and (4) clipped coupons during work hours (on one occasion) for over an hour. Thereafter, Blackwell substantiated these claims by comparing Hamil's logs to appellants' time sheets.

Meanwhile, shortly after the start of Blackwell's investigation, Wilson (as noted supra) became the interim director of Dawson County DFCS. Forrester approached Wilson in October 2007, and the two discussed Delong's misuse of leave, as well as her erratic, strange behavior. The appellants also spoke to members of the Dawson County Sheriff's Office regarding their concerns about Delong's prescription drug use and that she might drive while under the influence of those drugs, and then informed Wilson that they had made this disclosure. Throughout this entire time period, Wilson relayed the appellants' and his own concerns about Delong to upper management in DFCS.

In January 2008, Blackwell completed her investigation of Delong and the appellants, submitting the original version of the report to her supervisor. The final version was then signed in February 2008, and thereafter made its way up through the chain of command. When a DFCS field operations director eventually received the OIS report, she was "shocked" by the falsification of time sheets and abuse of leave by Delong and the appellants. And based upon Blackwell's investigation, the field operations director decided it was appropriate to terminate all of them. The field operations director's decision and subsequent recommendation of termination was based exclusively on the OIS report, and she was completely unaware of any reports by the appellants regarding their concerns with Delong. A DFCS employee relations analyst then agreed with the recommendation to terminate Delong and the appellants based on the serious misconduct outlined in the OIS report.[6]

Accordingly, Forrester was terminated because she (1) signed off on falsified time sheets, (2) took long lunches, (3) conducted personal errands during those long lunches, (4) went tanning during work hours, and (5) spent most of one workday at a hair appointment. Charnley was terminated for falsifying her time sheets, and Phillips was terminated for falsifying her time sheets and downloading and playing a game on her computer during work hours.[7]

Thereafter, the appellants filed suit under OCGA § 45-1-4,

---

[6] DFCS has a timekeeping policy, and the appellants acknowledged their understanding of this policy when they signed forms attesting to same.

[7] Delong was terminated for (1) her pattern of chronic absenteeism, (2) her dishonest statement to the investigator that she never took lunch, (3) her failure to perform supervisory duties, and (4) retaliatory conduct she directed toward Hamil for reporting her to OIS.

claiming that they were terminated in retaliation for making protected disclosures regarding Delong's unlawful workplace activity. They also contended that their time sheets accurately reflected a 40-hour work week, and that on the occasions when they spent time out of the office, they did so using "flex time" that DFCS employees were encouraged (if not mandated) to take—due to budget constraints—in order to avoid working overtime and receiving compensatory time (also known as "comp time"), for which DFCS was required to pay employees time-and-a-half. According to the appellants, this was a common practice at their office, and they were merely doing what they could to avoid the accrual of comp time. Thus, while the appellants admit that they did not accurately reflect the use of flex time on their time sheets, they claim that Forrester knew when Charnley and Phillips worked late and that she verbally approved their use of this time.[8]

DHS then moved for summary judgment, which the trial court granted because, in its view, the appellants failed to present evidence of retaliation. In its order, the trial court also briefly acknowledged the appellants' pending motion for the qualification of an expert witness, which the court likewise denied, and in doing so noted that the proposed expert-witness testimony would not have changed its decision. Forrester, Charnley, and Phillips now appeal the grant of summary judgment for DHS, as well as the trial court's refusal to consider qualifying their expert witness.

1. Appellants first contend that the trial court erred in granting summary judgment for DHS because there are genuine issues of material fact for a jury to resolve and this grant of summary adjudication violated our holding in *Jones v. Board of Regents of the University System of Georgia*.[9] We disagree.

A party that moves for summary judgment "must demonstrate that there is no genuine issue of material fact[ ] and that the undisputed facts, viewed in a light most favorable to the party opposing the motion, warrant judgment as a matter of law."[10] To prevail, the movant "must only point to an absence of evidence supporting *at least one essential element* of the plaintiff's claim."[11] Nevertheless, "[c]ircumstantial evidence may be sufficient to create

---

[8] According to the appellants, if an employee worked an hour of overtime one night, he or she could use that hour to come in late or leave early at another point during the week. And while Forrester, as a supervisor, could not accrue comp time, the policy at Dawson was that supervisors could keep up with their overtime and use flex time accordingly.

[9] 262 Ga. App. 75 (585 SE2d 138) (2003).

[10] *Id.* at 75-76.

[11] *Id.* at 76 (emphasis supplied).

a jury issue in the face of direct evidence to the contrary."[12] Thus, when there is direct evidence and positive testimony on a disputed issue, the nonmoving party must point to evidence that *genuinely* contradicts the testimony in question.[13] If the nonmoving party presents direct evidence of the contradictory fact, this is sufficient to allow for a jury's consideration of the dispute; however, "if the other fact is circumstantial evidence, it must be inconsistent with the [moving party's] evidence, or if consistent, it must demand a finding of fact on the issue in favor of the [nonmoving party]."[14] We may, of course, affirm a trial court's grant of summary judgment if it is right for any reason.[15]

We have addressed the issue of summary judgment in the context of whistle-blower claims in very few cases, none of which explicitly sets forth a standard for analyzing when summary judgment is appropriate in such circumstances.[16] In its summary-judgment brief below, DHS relied heavily on federal Title VII cases and suggested that the burden-shifting analysis used therein would be helpful in deciding whether summary judgment was appropriate under Georgia's whistle-blower statute. The trial court apparently agreed with DHS, citing federal Title VII cases throughout its order.

We agree that the *McDonnell Douglas* burden-shifting analysis used in Title VII *retaliation* cases is appropriately utilized in the context of evaluating whether a state whistle-blower claim is subject to summary adjudication,[17] and that this analytical framework is in

---

[12] *Id.* at 81 (4); *see also Furlong*, 246 Ga. App. at 123 (1).

[13] *See, e.g., Jones*, 262 Ga. App. at 81 (4); *Furlong*, 246 Ga. App. at 123 (1).

[14] *Jones*, 262 Ga. App. at 81 (4); *see also Furlong*, 246 Ga. App. at 123-24 (1).

[15] *Jones*, 262 Ga. App. at 77 (1).

[16] *See Edmonds v. Bd. of Regents of the Univ. Sys. of Ga.*, 302 Ga. App. 1 (689 SE2d 352) (2010) (affirming grant of summary judgment because plaintiff's communication was not protected by the statute); *Jones*, 262 Ga. App. 75 (reversing grant of summary judgment because plaintiff presented circumstantial evidence that termination was in retaliation for disclosure of information); *Weaver v. N. Ga. Reg'l Educ. Serv. Agency*, 238 Ga. App. 72 (517 SE2d 794) (1999) (reversing grant of summary judgment on basis of agency's status and the type of communication made by the plaintiff), *reversed by N. Ga. Reg'l Educ. Serv. Agency v. Weaver*, 272 Ga. 289 (527 SE2d 864) (2000) (reversing this Court's reversal of summary judgment because, at the time, the defendant was not an agency covered by the whistle-blower statute). We also note that the statute has been amended a number of times between these decisions, which to some extent limits their applicability to the *current* language of the statute. *See* Ga. L. 2005, Act 213, § 1 (changing provisions related to complaints or information regarding fraud, waste, and abuse, and providing for related matters); Ga. L. 2007, Act 206, § 1 (expanding list of employees, officials, and administrators protected by statute; changing definition of "retaliate"; and providing for related matters); Ga. L. 2009, Act 155, §§ 1, 2 (adjusting designation of State Merit System of Personnel Administration to State Personnel Administration).

[17] *See McDonnell Douglas Corp. v. Green*, 411 U. S. 792, 802-06 (93 SC 1817, 36 LE2d 668) (1973), *as modified by St. Mary's Honor Center v. Hicks*, 509 U. S. 502 (113 SC 2742, 125 LE2d 407) (1993) *and Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U. S. 133 (120 SC 2097, 147

no way inconsistent with our prior decision in *Jones*, in which we held that circumstantial evidence may preclude summary judgment in these cases.[18] This is because the *McDonnell Douglas* burden-shifting analysis rightly places on the plaintiff the ultimate burden of proving that he or she was the victim of discrimination.[19] We, therefore, apply the following analytical framework to claims brought pursuant to OCGA § 45-1-4 (d) (2): (1) the plaintiff must establish a prima facie case of retaliation by a preponderance of the evidence; (2) if a prima facie case is established by the plaintiff, the employer must, nevertheless, articulate a legitimate, non-retaliatory reason for the adverse employment action taken; and (3) when such a reason is given by the employer, the plaintiff must demonstrate that the stated reason for the employer's adverse action is pretextual.[20] With this analytical framework in mind, we now turn to the appellants' enumeration of error.

(a) *Prima Facie Case of Retaliation.*

To establish a prima facie case of retaliation under OCGA § 45-1-4 (d) (2), the employee must present evidence that (1) the employer falls under the statute's definition of "public employer";[21] (2) the employee disclosed "a violation of or noncompliance with a law, rule, or regulation to either a supervisor or government agency";[22] (3) the employee was then discharged, suspended, demoted, or suffered some other adverse employment decision by the public employer;[23] and (4) there is some causal relation between (2) and (3).[24]

---

LE2d 105) (2000); *see also Heng v. Rotech Med. Corp.*, 720 NW2d 54, 62-63 (III) (A), (B) (N. D. 2006) (applying *McDonnell Douglas* burden-shifting analytical framework to state whistleblower suit); *Cokley v. City of Otsego*, 623 NW2d 625, 630 (Minn. App. 2001) (same).

[18] *See Jones*, 262 Ga. App. 75 (reversing grant of summary judgment because plaintiff presented circumstantial evidence that termination was in retaliation for disclosure of information).

[19] *See Bailey v. Stonecrest Condo. Ass'n, Inc.*, 304 Ga. App. 484, 488 (1) (696 SE2d 462) (2010) (holding that "[c]laims based on circumstantial evidence are subject to a burden-shifting analysis that was first developed by the United States Supreme Court for employment discrimination cases in *McDonnell Douglas Corp. v. Green*").

[20] *Cf. McDonnell Douglas Corp.*, 411 U. S. at 802-05 (II); *Bailey*, 304 Ga. App. at 490 (1) (b).

[21] *See* OCGA § 45-1-4 (a) (4).

[22] *See* OCGA § 45-1-4 (a) (2).

[23] *See* OCGA § 45-1-4 (a) (5).

[24] *Cf. Pennington v. City of Huntsville*, 261 F3d 1262, 1266 (II) (A) (11th Cir. 2001) ("To establish a prima facie case of retaliation under Title VII, a plaintiff must show that (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) there is some causal relation between the two events." (citation and punctuation omitted)). The causal link requires that the plaintiff prove that the protected disclosure and adverse employment action are not completely unrelated. *Cf. Pennington*, 261 F3d at 1266 (II) (A) (explaining same as related to Title VII retaliation claims); *Hall v. Bodine Elec. Co.*, 276 F3d 345, 357 (7th Cir. 2002) (Manion, J.) (same).

And here, in appealing the grant of summary judgment for DHS, appellants claim to have presented "overwhelming circumstantial evidence" of retaliation and "abundant direct evidence[ ] that clearly establishes that DFCS retaliated against [them] for reporting abuse, fraud, and waste as defined in [the whistle-blower statute.]"[25] In actuality, the appellants' deposition testimony shows that they did *not* have *any* direct evidence of retaliation. Indeed, Charnley explicitly testified during her deposition that she was never told by anyone in a supervisory capacity that she and the other appellants were being fired because of their communications regarding Delong; and neither Forrester nor Phillips claim otherwise. Appellants, then, must rely solely on circumstantial evidence in establishing a prima facie case of retaliation under OCGA § 45-1-4 (d) (2).

(i) *Public Employer.* As noted supra, in order to make out a prima facie case of retaliation under OCGA § 45-1-4, the appellants must first show that DHS is a public employer within the meaning of the statute.[26] This prong of the test is easily met by the appellants because the parties agree that DHS is a public employer within the meaning of OCGA § 45-1-4 (a) (4).

(ii) *Whistle-Blowing Activity.* Next, appellants must show that they engaged in whistle-blowing—i.e., that they disclosed "a violation of or noncompliance with a law, rule, or regulation to either a supervisor or a government agency."[27] We will consider each of the appellants' allegedly protected disclosures in turn.

First, the appellants *all* testified in their depositions that De-

---

[25] We note that OCGA § 45-1-4 only covers complaints of "abuse, fraud, and waste" in the context of a public employer's ability to receive and investigate such complaints by public employees, *not* in the context of retaliation, which explicitly only encompasses disclosures of "violation[s] of or noncompliance with a law, rule, or regulation." *See* OCGA § 45-1-4 (b) ("A public employer may receive and investigate complaints or information from any public employee concerning the possible existence or any activity constituting fraud, waste, and abuse in or relating to any state programs and operations under the jurisdiction of such public employer."); OCGA § 45-1-4 (d) (1)-(3) (retaliation provisions); *see also* note 16 *supra* (citing amendments to statute).

[26] "Public employer" means

the executive, judicial, or legislative branch of the state; any other department, board, bureau, commission, authority, or other agency of the state which employs or appoints a public employee or public employees; or any local or regional governmental entity that receives any funds from the State of Georgia or any state agency.

OCGA § 45-1-4 (a) (4); *see Weaver*, 272 Ga. at 290 (holding that, prior to amendment, OCGA § 45-1-4 "applies solely to persons employed in state government" and that regional agencies are not "clearly part of either state or local government").

[27] *See* OCGA § 45-1-4 (d) (2). The statute specifically defines "law, rule or regulation" as including "any federal, state, or local statute or ordinance or any rule or regulation adopted according to any federal, state, or local statute or ordinance." OCGA § 45-1-4 (a) (2); *see Edmonds*, 302 Ga. App. at 6-7 (1) (summary judgment appropriate when employee raised concerns regarding laboratory adherence with accepted biosafety rules, which were not the type of disclosure protected by the statute).

long's illnesses and excuses were a "running joke" with Dawson County DFCS directors, that everybody (employees and directors included) knew about Delong's abuse of prescription drugs, and that Delong's chronic absenteeism and drug use were discussed at the office on a daily basis. The appellants also presented other testimony that Delong's problems with prescription drug use were common knowledge in the office because it was "obvious," and this evidence only served to corroborate the evidence presented by DHS that Delong's problems were no secret and were, sadly, considered a laughing matter by most of the office's employees. Thus, to the extent the appellants claim to have disclosed something that was already widely known (and even joked about), we cannot say that this is the type of communication encompassed by the whistle-blower statute.[28]

Second, there was deposition testimony by various Dawson County DFCS directors and interim directors that the concerns expressed by the appellants were *personal* concerns about Delong regarding her excessive absences from the office and use of prescription medication. Former-Interim Director Rice testified during her deposition that she did not consider Forrester's communications "whistle-blowing" because Forrester and Delong were friends. Instead, Rice explained that she understood and interpreted these communications from Forrester as an expression of concern for a friend and not as a report of a policy violation.[29] And Former-Director Gore likewise did not consider Forrester's communications about Delong to be whistle-blowing; she instead viewed Delong's problems as something that she needed to monitor closely in order to develop her own conclusions about the severity of the situation. Indeed, even Forrester testified that she did not consider her communications with any former Dawson County DFCS directors and interim directors—including the June 2007 communication with Rice—as "whistle-blowing" because (1) Delong's problems were commonly discussed and joked about and (2) she only wanted Delong to get the help she needed. Thus, to the extent the appellants were merely expressing their personal concern about a troubled friend, we cannot

---

[28] *See* OCGA § 45-1-4 (a) (2) (defining "law, rule or regulation" as including "any federal, state, or local statute or ordinance or any rule or regulation adopted according to any federal, state, or local statute or ordinance"); *see also Edmonds*, 302 Ga. App. at 6-7 (1) (summary judgment appropriate when employee raised concerns regarding laboratory adherence with accepted biosafety rules, which were not the type of disclosure protected by the statute); *Jones*, 262 Ga. App. at 81 (4) (reversing grant of summary judgment when employee disclosed suspected internal thefts to supervisor).

[29] Rice also testified that she did not require Delong to take a drug test after Forrester's communication because, after discussing Forrester's concern with her own supervisor, she was not directed to do so.

say that this type of communication is encompassed by the whistle-blower statute.[30]

Third, appellants also maintain that the disclosures they made to members of the Dawson County Sheriff's Office are protected because "[n]o other DFCS employee engaged in the same type of protected activity." And while disclosures of "a violation of or noncompliance with a law, rule, or regulation to . . . a government agency" are protected by the whistle-blower statute,[31] a review of the affidavits made by members of the Dawson County Sheriff's Office and a member of Dawson County Emergency Services reveals that the appellants' communications with these individuals amounted to no more than complaints about Delong's chronic absenteeism and requests for advice on dealing with her suspected addiction to pain medication. Accordingly, we cannot say that this type of disclosure falls within the protection of the statute.[32]

Finally, the appellants testified during their depositions that they spoke with Interim Director Wilson in January 2008 to complain about Delong's abuse of prescription drugs after she was in a car accident, and expressed their concern about her potentially transporting foster children while under the influence of drugs. Charnley also claimed that she spoke to Wilson about Delong attending a staff meeting while impaired. And while Wilson did not recall speaking with appellants about either of the foregoing matters, he did recall speaking with them in late January 2008 about their concerns regarding Delong's foul language, her lack of supervision over employees, her lack of oversight on spending, and her frequent absences—all of which Wilson relayed to DFCS upper management. Wilson claims, however, that he did not consider the appellants whistle-blowers when they approached him about their concerns related to Delong. Nevertheless, to the extent there is conflicting testimony as to whether the appellants expressed their concerns to Wilson—a supervisor—about Delong's workplace intoxication and her potentially transporting foster children while under the influence of drugs (communications that would fall within the ambit of the whistle-blower statute),[33] there is a genuine issue of material fact as to whether these particular communications in fact occurred.

(iii) *Adverse Employment Action.* Next, appellants must show

---

[30] *See* OCGA § 45-1-4 (a) (2); *see also Edmonds*, 302 Ga. App. at 6-7 (1); *Jones*, 262 Ga. App. at 81 (4).

[31] *See* OCGA § 45-1-4 (d) (2).

[32] *See* OCGA § 45-1-4 (a) (2); *see also Edmonds*, 302 Ga. App. at 6-7 (1); *Jones*, 262 Ga. App. at 81 (4).

[33] *See* OCGA § 45-1-4 (d) (2).

that they suffered an adverse employment action.[34] And here, it is undisputed that they were terminated from their employment with DFCS.

(iv) *Causal Connection.* Finally, because there is a genuine issue of material fact as to whether the appellants made protected disclosures to Wilson (see discussion supra), the appellants must show that these communications and the adverse employment action are causally connected—i.e., that there is evidence *linking* their complaints about Delong to the adverse-employment action taken against them.[35] A plaintiff can establish such a causal connection by showing that the decision-maker was aware of the protected disclosure and that the disclosure and action were not wholly unrelated.[36] In this respect, some cases even "accept mere temporal proximity between an employer's knowledge of protected activity and adverse employment action as sufficient evidence of causality to establish a prima facie case."[37]

In the case sub judice, it is undisputed that the final decision to terminate the appellants was made by the DFCS field operations director, who based her decision solely upon the OIS report. The field operations director made this decision after the report was forwarded to her by an employee relations analyst with the Office of Human Resource Management and Development ("OHRMD") with DHS. This employee relations analyst reviewed the OIS report and then consulted with OHRMD's manager of employee relations. Both agreed that termination of appellants' employment was appropriate and in line with disciplinary actions taken in other cases of similar misconduct.

The OHRMD representatives spoke to Wilson about their rec-

---

[34] *See* OCGA § 45-1-4 (a) (5). The statute refers to "the discharge, suspension, or demotion by a public employer of a public employee or any other adverse employment action taken by a public employer against a public employee in the terms or conditions of employment. . . ." *Id.*

[35] *Pattee v. Ga. Ports Auth.*, 477 FSupp.2d 1272, 1276 (III) (B) (S.D. Ga. 2007) (interpreting Georgia's whistle-blower statute). We note that "[i]t is not enough . . . that a state employer had a policy of stamping out internal dissent; a [whistle-blower] plaintiff must allege that he dissented and was thereby stamped." *Id.*

[36] *See Clover v. Total Sys. Servs., Inc.*, 176 F3d 1346, 1354 (III) (B) (11th Cir. 1999) ("At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took adverse employment action." (citation and punctuation omitted)).

[37] *Clark County School Dist. v. Breeden*, 532 U. S. 268, 273 (121 SC 1508, 149 LE2d 509) (2001) (per curiam) (citing various cases to hold that temporal proximity must be "very close," and periods of three to four months are insufficient); *see also Higdon v. Jackson*, 393 F3d 1211, 1220 (III) (A) (2) (11th Cir. 2004) ("A close temporal proximity between the protected expression and an adverse action is sufficient circumstantial evidence of a causal connection for purposes of a prima facie case." (citation and punctuation omitted)); *Jones*, 262 Ga. App. at 81 (4).

ommendation, but he was actually *resistant* to terminating all four employees. As a result, OHRMD then contacted the DFCS field operations director (who was higher than Wilson in the chain of command), and she is the one who ultimately decided that terminating the employment of Delong and the appellants was indeed the appropriate course of action. In making this decision, the field operations director did not communicate with any of the parade of former Dawson County DFCS directors, interim directors, or with Wilson.[38]

Moreover, DHS presented direct evidence (in the form of e-mails from the field operations director) that Dawson County DFCS Interim Director Wilson delivered termination letters to the employees per the field operations director's decision and that her decision was based solely on the OIS report. Wilson also testified below that he had no role in the decision to terminate Delong or the appellants, that he did not take any action against the appellants for approaching him about their concerns regarding Delong, and that his sole role was to deliver the message that they had been terminated. Indeed, Wilson told Hamil as much when Hamil inquired as to the status of the investigation—i.e., that the decision would come from a higher office and that somebody else would tell him what to do.[39]

Furthermore, Charnley and Forrester's own deposition testimony cuts against the appellants' claims that Wilson retaliated against them for expressing their concerns about Delong. Specifically, Charnley and Forrester testified about how Wilson told them, along with Delong and Phillips, that the investigation was over and that he had been *instructed* to give them letters of termination.[40] Additionally, the undisputed evidence shows that other employees likewise made complaints about Delong (even that Delong was abusing prescription drugs), but they were not terminated or otherwise disciplined.

Nevertheless, the appellants point to the close proximity in time between the decision to terminate them in February 2008 and their communications with Wilson in January 2008 about Delong. In *Jones*, we found circumstantial evidence of a causal connection

---

[38] The appellants also testified that they never spoke to the field operations director and that they did not even know who she was.

[39] The recommendation was forwarded to Wilson through DHS human resources, he forwarded the recommendation to the regional office, and the regional director instructed him to terminate Delong and the appellants. And what the appellants characterize as a "notification" by DFCS management that they would not be terminated was actually an informal conversation with a former Dawson DFCS director, who told Forrester (while the investigation was ongoing) that the appellants would "be fine" but that she was not sure about Delong.

[40] Charnley also testified that when she told Wilson that the situation was "BS," he agreed with her.

through the close proximity in time between the employee's protected activity and the adverse employment action, and by the employer's interference with the employee's protected activity.[41] However, appellants' proximity-in-time argument in the case sub judice is seriously undermined (if not eviscerated) by the fact that the investigation ultimately leading to their dismissals had already begun by the time Wilson was named interim director of Dawson County DFCS.

The appellants also point to the deposition testimony of Cathy Conlon, another Dawson County DFCS employee, as evidence that at least one other employee feared the appellants would suffer retaliation for reporting Delong's conduct. But when read in the context of her entire deposition, it is clear that what Conlon feared was that *Delong* would retaliate against the appellants for notifying superiors about their concerns. Indeed, almost *all* of the deposition testimony regarding suspected retaliation concerned fears of *Delong's* reaction once she learned about the complaints concerning her conduct. As Charnley testified, she feared that Delong would "make life hell" if she learned of the complaints because she was already abusive toward her co-workers. Phillips likewise testified that she did not report Delong's conduct to Blackwell because of Delong's reputation for exacting revenge. Thus, Conlon's testimony does not establish a causal link between the appellants' disclosures and their subsequent dismissals.

Finally, appellants highly tout the testimony of Jason Sauls, a DFCS trainer for DHS, who averred below that his personal experience in DFCS Region 2 led him to believe that upper management preferred to terminate employees as an alternative to dealing with personnel issues, and he speculated that the appellants' complaints are what actually resulted in their terminations. Sauls also testified, however, that (1) he had no personal knowledge that the appellants were in fact fired in retaliation for their complaints; (2) he was not privy to the appellants' termination process; (3) he did not discuss their termination with Wilson; (4) he did not discuss the investigation with Blackwell; and (5) he had not even read the OIS report.[42] Indeed, Sauls admitted that his conclusion of retaliation was based merely on an assumption. Accordingly, Sauls's testimony is nothing more than mere speculation that raises only a conjecture or possibility.[43]

In sum, the appellants have presented no evidence that the

---

[41] *See Jones*, 262 Ga. App. at 81 (4).

[42] As of February 2010, when his affidavit was filed, Sauls had eventually reviewed the OIS report, but this was only *after* his deposition in September 2009.

[43] *See Taylor v. N.I.L., Inc.*, 221 Ga. App. 99, 100 (470 SE2d 491) (1996).

actual decision-maker knew about their disclosures to Wilson about Delong or that Wilson himself had any role in their termination other than to deliver the message of their dismissals. And with no evidence that the actual decision-maker knew about their disclosures to Wilson, mere guesses and speculation are all that the appellants present in support of a causal connection between these disclosures and their subsequent terminations. Suffice it to say, this is not enough to survive a motion for summary judgment. Indeed, mere speculation as to an employer's motives in terminating an employee is not "sufficient to create even an inference of fact for consideration on summary judgment."[44] Thus, because appellants cannot show a causal connection between a protected disclosure and the adverse employment action taken against them, they cannot make out a prima facie case of retaliation; and as such, summary judgment for DHS was proper.

2. Appellants also appeal the trial court's refusal to qualify Jason Sauls as an expert, claiming the trial court "ruled, without considering evidence, that to qualify as an expert witness, a person must be employed by the alleged wrongdoer, participated in the alleged wrongdoing, and hold the same job title as the alleged wrongdoer." What the trial court actually ordered as related to Sauls was as follows:

> Finally, Plaintiffs allege that an affidavit from Jason Sauls, who works for DFCS as a Social Services Trainer, precludes summary judgment because he claims that the decision to terminate Plaintiffs' employment was retaliatory. There is no evidence that Mr. Sauls was consulted or otherwise involved in the OIS Investigation or termination decisions for Plaintiffs. Therefore, his non-supervisor's opinion does not raise a genuine issue of material fact regarding Defendants' rationale for terminating Plaintiff's employment.

As explained in Division 1, we, like the trial court, do not believe Sauls's testimony provided *any* evidence, let alone expert testimony, that would preclude summary judgment in favor of DHS. And as to appellants' request to qualify Sauls as an expert, the trial court had discretion in determining whether expert testimony was necessary.[45]

Appellants apparently intended to present Sauls as an expert

---

[44] *Taylor*, 221 Ga. App. at 100 (citations and punctuation omitted).

[45] OCGA § 24-9-67.1 (d) ("Upon motion of a party, the court *may* hold a pretrial hearing to determine whether the witness qualifies as an expert and whether the expert's testimony satisfies the requirements of subsections (a) and (b) of this Code section." (emphasis supplied)); *see also Williamson v. Harvey Smith, Inc.*, 246 Ga. App. 745, 748 (3) (542 SE2d 151) (2000) ("The question of whether a witness is qualified to render an opinion as an expert is a

because of his "specialized knowledge . . . as to the organizational structure of DFCS, both for Region 2 as well as the State" and his "familiar[ity] with many of the people who are part of the DFCS management." Appellants claim that due to Sauls's history with the agency and his position as a project administrator, "[n]o one in the world is a more qualified expert witness to testify about the byzantine organizational structure of DFCS, its complex, often overlapping policies and procedures, and the specific obligations and duties of DFCS management and employees." Appellants also contend that DFCS job titles and the "acronyms alone in the lexicon of DFCS boggle the mind and are 'shrouded in the mystery of professional skill and knowledge' " such that expert testimony is necessary. We disagree.

When a factual contention is one not "capable of proof *only* by expert testimony," it is not necessary to produce expert testimony.[46] Any use of Sauls as an expert in the case sub judice (for all of the reasons noted supra) was, then, wholly unnecessary because the above-noted areas are not issues beyond the ken of lay persons.[47] Thus, pretermitting the issue of whether Sauls was even qualified to give an expert opinion in an employment retaliation case,[48] Sauls's proffered testimony in no way precluded summary judgment in favor of DHS as appellants claim.[49]

*Judgment affirmed. Blackwell, J., concurs. Barnes, P. J., concurs in judgment only.*

---

legal determination for the trial court and will not be disturbed absent a manifest abuse of discretion." (citation and punctuation omitted)).

[46] *BSF, Inc. v. Cason*, 175 Ga. App. 271, 273 (2) (333 SE2d 154) (1985); *see also Abernethy v. Cates*, 182 Ga. App. 456, 456-57 (1) (356 SE2d 62) (1987) ("Expert testimony is permitted if the nature of the question is such that factors leading to a conclusion are not known to the common or average man, but are among those things shrouded in the mystery of professional skill or knowledge." (citation and punctuation omitted)).

[47] *See Gianotti v. Beleza Hair Salon, Inc.*, 296 Ga. App. 636, 642 (2) (675 SE2d 544) (2009) ("The proper interpretation of the product instructions was not an issue beyond the ken of laypersons[.]"); *Purcell v. Kelley*, 286 Ga. App. 117, 118 (1) (648 SE2d 454) (2007) (holding that expert testimony was unnecessary because jury capable of determining the color of a traffic light).

[48] In the brief supporting their motion to qualify Sauls as an expert witness, the appellants mentioned that Sauls had been offered as an expert by DFCS "in hundreds of cases . . . focusing on deprivation and parental termination issues" and had extensive training in those areas, but we do not see how this has any bearing on Sauls's ability to testify as an expert on issues related to employment retaliation.

[49] *See Hadden v. ARE Props., Inc.*, 280 Ga. App. 314, 316-17 (1) (633 SE2d 667) (2006) (holding that because expert testimony on issue was unnecessary, the proffered testimony did not preclude summary judgment). *Compare Layfield v. Dep't of Transp.*, 280 Ga. 848, 851 (1) (632 SE2d 135) (2006) (holding that proffered expert testimony on technical issue of proximate cause in an automobile accident precluded summary judgment).

BARNES, Presiding Judge, concurring in judgment only.

While I concur with the result reached by the majority in this case, I do not agree with all that is said. Accordingly, I concur in the judgment only.[50]

DECIDED MARCH 24, 2011 — 

*Fox, Chandler, Homans, Hicks & McKinnon, David A. Fox, Sidney O. Smith III*, for appellants.

*Thurbert E. Baker, Attorney General, Annette M. Cowart, Senior Assistant Attorney General, Romy D. Smith, Assistant Attorney General*, for appellee.

---

[50] "If an appeal is decided by a Division, a judgment in which all three judges fully concur is a binding precedent; provided, however, an opinion is physical precedent only with respect to any Division of the opinion for which there is a concurrence in the judgment only or a special concurrence without a statement of agreement with all that is said." Court of Appeals Rule 33 (a).