**WHOLE COURT**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**November 21, 2014**

# In the Court of Appeals of Georgia

A14A1220. ALBERS v. GEORGIA BOARD OF REGENTS OF
    THE UNIVERSITY SYSTEM OF GEORGIA et al.

PHIPPS, Chief Judge.

On November 19, 2009, Christophers Albers was given written notice that he would be terminated from his position as Chief of Police at Georgia Perimeter College ("GPC"). Asserting a wrongful termination claim under the Georgia Whistleblower Statute,[1] Albers sued the Georgia Board of Regents of the University System of Georgia, GPC, and GPC's President. The defendants moved for summary judgment, arguing that the facts did not support a whistleblower claim and that the applicable statute of limitation barred the action. The trial court granted the motion, and Albers appeals. For reasons that follow, we reverse.

---

[1] See OCGA § 45-1-4.

Summary judgment is appropriate when no genuine issues of material fact remain and the moving party is entitled to judgment as a matter of law.[2] We review the grant of summary judgment de novo, construing the evidence and all reasonable conclusions and inferences drawn from it in the light most favorable to the non-moving party.[3]

So viewed, the record shows that Albers began working for GPC as Chief of Police in March 2005. In this role, he served as chief executive of GPC's department of public safety, overseeing security services, police procedure, parking control, homeland security, and other security matters. According to Albers, his supervisor, Executive Vice President Ronald Carruth, had never criticized his performance prior to November 2008. That changed, however, following an incident in late October of that year.

On October 28, 2008, a GPC student reported to the public safety department that his laptop was missing from a classroom. GPC officers investigated, concluded that another student had taken the computer, and obtained a warrant for her arrest. In the meantime, the suspect's mother contacted the school, complaining about how her

[2] See *Caldon v. Bd. of Regents &c.*, 311 Ga. App. 155 (715 SE2d 487) (2011).

[3] See id.

daughter had been treated by GPC officers. After this complaint, several college administrators, including the dean of student services and director of human resources ("HR"), instructed Albers to speak with the district attorney about having the charges against the student reduced or dropped. Albers refused, telling Carruth: "[I]t would be inappropriate and unethical for me to try and influence the DA in any way as to how he would handle this case."

At some point, the HR director commenced her own investigation into the laptop incident. Albers and his deputy chief objected to the HR inquiry, asserting that it interfered with their ongoing criminal investigation and obstructed justice. Albers discussed the concurrent HR investigation with an assistant district attorney, who indicated that HR's inquiry was improper. Following this conversation, Albers informed Carruth that GPC should not attempt to influence the outcome of the criminal prosecution, and he continued to object to the administration's interference in the police investigation.

The record further shows that Albers's interference objections were not limited to the laptop incident. According to Albers, the administration "repeatedly insert[ed] itself improperly into criminal investigations." On one occasion, for example, Anthony Tricoli, the President of GPC, told Albers how to proceed with a criminal

investigation involving a student and instructed him to work directly with the dean of student services. When Albers objected that Tricoli had overstepped his bounds and was interfering with a police inquiry, Tricoli responded, "I'm the President."

By the spring of 2009, the relationship between the college administration and the public safety department "was extremely strained," and Albers believed that his job was in jeopardy. According to Albers, Carruth was undermining his authority, and the HR director was overtly hostile toward him. Also during this period, an audit revealed that Albers had used a GPC warehouse to receive and store large amounts of grain that he needed for his "home brewers" beer-making club. Although GPC's director of logistical services had given Albers permission to use the warehouse, Carruth and Tricoli asserted that Albers had exercised poor judgment in having beer grain delivered to the campus.

On June 16, 2009, GPC issued a written reprimand and one-day suspension to Albers in connection with the beer grain deliveries. A few days later, on June 19, 2009, GPC suspended Albers indefinitely after concluding that he had violated a direct order not to discuss certain matters with his staff.

Carruth met with Albers on June 25, 2009, and told him that he should resign or he would be terminated. Albers initially agreed to resign, and Carruth indicated to

4

Albers that he was in a "transition period," which Albers understood to mean a "transition out the door." Over the next few months, Albers performed special projects for Carruth, but he no longer functioned as the GPC police chief and had no authority within the GPC public safety department. At that point, Albers knew his employment would be ending. He also "felt that [he] was being retaliated against for . . . upholding[ing] the law."

In August 2009, Carruth asked Albers to sign a "Letter of Understanding" that outlined, among other things, his limited responsibilities and duties going forward at GPC, as well as an agreement that he submit his resignation. The letter further stated: "[I]t is estimated that your last day with GPC will be December 31, 2009, or whenever you find employment, whichever comes first." Albers refused to sign the letter, did not agree to its terms, and told Carruth that he had decided not to resign from his position.

On November 19, 2009, Carruth issued a termination letter to Albers, which provided: "You will be terminated from your position effective December 11, 2009 for unsatisfactory job performance." Less than one year later, on November 10, 2010, Albers filed this suit, asserting that his termination constituted improper retaliation under the whistleblower statute. The defendants subsequently moved for summary

judgment. The trial court granted the motion, finding that (1) Albers did not engage in protected whistleblowing activity; (2) even if Albers had engaged in protected activity, no causal connection existed between that activity and his termination; (3) Albers was terminated for legitimate business reasons; and (4) Albers's claim was barred by the statute of limitation.

1. Under Georgia's whistleblower statute, a public employer may not retaliate against a public employee for disclosing "a violation of or noncompliance with a law, rule, or regulation to either a supervisor or a government agency" or for "objecting to, or refusing to participate in, any activity, policy, or practice of the public employer that the public employee has reasonable cause to believe is in violation of or noncompliance with a law, rule, or regulation."[4] The term "retaliate" refers to

> the discharge, suspension, or demotion by a public employer of a public employee or any other adverse employment action taken by a public employer against a public employee in the terms or conditions of employment for disclosing a violation of or noncompliance with a law, rule, or regulation to either a supervisor or government agency.[5]

---

[4] OCGA § 45-1-4 (d) (2), (3).

[5] OCGA § 45-1-4 (a) (5).

6

To establish a claim under the statute, a public employee must demonstrate that (1) he was employed by a public employer; (2) he made a protected disclosure or objection; (3) he suffered an adverse employment action; and (4) there is some causal relationship between the protected activity and the adverse employment action.[6] The parties do not dispute the trial court's finding that Albers was a public employee employed by a public employer. The question on appeal is whether he offered evidence supporting the other elements of his claim.

(a) The defendants argue, and the trial court found, that Albers never engaged in protected whistleblowing activity. Albers, however, objected to the administration's directive that he speak with the district attorney about having the charges against the suspected laptop thief dropped or reduced. He also took exception to the HR laptop investigation, relaying to Carruth his understanding from an assistant district attorney that the investigation was improper and that "it is illegal for any entity to try and influence the outcome of a criminal case in any way."

The trial court dismissed these objections, finding that they "were about potential, speculative, or nonexistent violations . . . none of which constitute

---

[6] See OCGA § 45-1-4 (d); see also *Forrester v. Ga. Dept. of Human Svcs.*, 308 Ga. App. 716, 722 (1) (a) (708 SE2d 660) (2011) (physical precedent only) (setting forth elements of prima facie case under OCGA § 45-1-4).

7

protected activity under [OCGA § 45-1-4]."[7] But the whistleblower statute protects a public employee who objects to employer-related activity that he reasonably believes violates the law.[8] And particularly given Albers's communication with the assistant district attorney, at least some evidence supports the conclusion that Albers opposed specific, ongoing activity by GPC's administration that he reasonably believed obstructed justice.[9] The trial court, therefore, erred in granting summary judgment on this ground.[10]

(b) The trial court also found summary judgment appropriate on the issue of causation. According to the court, the substantial delay between the alleged

---

[7] See, e.g., *Brathwaite v. Fulton-DeKalb Hosp. Auth.*, 317 Ga. App. 111, 115 (2) (729 SE2d 625) (2012) (physical precedent only) (affirming grant of summary judgment to defendant where disclosures supporting whistleblower claim involved potential illegal activity that might occur in future).

[8] OCGA § 45-1-4 (d) (3).

[9] See OCGA § 16-10-24 (a) ("[A] person who knowingly and willfully obstructs or hinders any law enforcement officer in the lawful discharge of his official duties is guilty of a misdemeanor."); *Kendrick v. State*, 324 Ga. App. 45, 46 (1) (749 SE2d 45) (2013) (whether defendant's conduct constituted obstruction of a law enforcement officer "was for the trier of fact to decide").

[10] See OCGA § 45-1-4 (d) (3). We express no opinion as to whether any other objections or disclosures by Albers might support his claim under OCGA § 45-1-4.

8

whistleblowing activity and Albers's termination undermined any causal link between the events as a matter of law. We disagree.

The causation element in a whistleblower case "is construed broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated."[11] It is true that timing may be important in the causation analysis. As we have noted, a retaliation claim fails "[i]f there is a substantial delay between the protected expression and the adverse action in the absence of other evidence tending to show causation."[12] In this case, however, other evidence raises a question of fact as to causation.

Carruth testified that one of the underlying reasons for Albers's termination was the inability of the public safety department and the HR department to work as a team. He explained that the relationship between these departments deteriorated during the laptop investigation, as Albers continually objected to the HR inquiry and his deputy chief threatened to arrest the HR director for involving herself in the

---

[11] *Freeman v. Smith*, 324 Ga. App. 426, 431 (1) (750 SE2d 739) (2013) (citation and punctuation omitted); see also *Forrester*, supra at 726 (1) (a) (iv) ("plaintiff can establish such a causal connection by showing that the decision-maker was aware of the protected disclosure and that the disclosure and action were not wholly unrelated") (physical precedent only).

[12] *Freeman*, supra (citation and punctuation omitted).

criminal investigation. Based on such testimony, a jury could conclude that Albers's handling of the laptop incident, his expressed objections to the concurrent HR investigation, and the concerns he raised about administrative interference factored into the termination decision. Accordingly, the record contains some evidence of a causal connection between the alleged whistleblowing activity and the termination.[13]

(c) The trial court also found that GPC terminated Albers for legitimate business reasons – including insubordination, failure to effectively manage his subordinate employees, and his involvement with the beer grain deliveries – rather than for participating in protected whistleblowing activity. Again, however, there is some evidence that the bad relationship between the HR and public safety departments, which deteriorated during the laptop investigation, was a catalyst for the termination decision. As explained by Carruth, "the wheels came off of the Public Safety car" with the laptop incident.

Although the defendants offered other reasons for the termination, a jury could find that Albers's continuing claims of administrative impropriety during the laptop investigation undermined the public safety-HR relationship and drove the termination

---

[13] Compare id. at 433 (whistleblower defendant entitled to summary judgment where substantial delay existed between whistleblowing activity and adverse employment action and plaintiff offered no evidence of a causal link).

decision. Under these circumstances, a factual issue remains as to whether the defendants dismissed Albers based on protected whistleblowing activity.[14]

2. Finally, the trial court concluded that Albers's claim was barred by the applicable statute of limitation. Under OCGA § 45-1-4 (e) (1), a public employee must institute a whistleblower claim "within one year after discovering the retaliation or within three years after the retaliation, whichever is earlier." Albers filed his claim on November 10, 2010, less than one year after receiving the November 19, 2009 termination letter. The trial court, however, found that Albers discovered the retaliation much earlier, rendering his claim untimely.

In reaching this decision, the court relied on *Stokes v. Savannah State University*,[15] a federal decision that addresses when a cause of action accrues under OCGA § 45-1-4. The *Stokes* court noted that, under federal anti-discrimination law,

---

[14] See J*ones v. Bd. of Regents &c.*, 262 Ga. App. 75, 81-82 (4) (585 SE2d 138) (2003) (trial court erred in granting summary judgment to defendant on whistleblower claim where plaintiff presented circumstantial evidence that he was terminated in retaliation for making protected disclosure); compare *Caldon*, supra at 160 (defendants in whistleblower case entitled to summary judgment where they offered legitimate reasons for termination and plaintiff "failed to point to any other evidence that would establish a fact question for the employer's motive").

[15] 2007 U.S. Dist. LEXIS 90120 (S.D. Ga. Dec. 7, 2007), *aff'd*, 291 Fed. Appx. 931 (11th Cir. 2008).

the accrual date of the cause of action for limitations purposes is the date on which the adverse employment action is communicated to the plaintiff, even if the plaintiff continues working for a period of time or if there is an internal appeals procedure.[16]

Applying this reasoning to the whistleblower statute, the *Stokes* court found that its claimant became "aware of the alleged retaliation when he received [an] initial letter of termination."[17] Similarly, in *Tuttle v. Bd. of Regents &c.*,[18] a case recently decided by this court, we held that a whistleblower's claim accrued when he received verbal and written notice that he was to be terminated on a particular date.[19] Upon receiving the notice, the claimant "discovered the retaliation in question."[20]

Citing *Stokes*, the trial court determined that the adverse employment action was communicated to Albers on several occasions in the summer of 2009, including on June 25, 2009, when Carruth told him that he needed to resign or would be terminated, and in August 2009, when Albers reviewed a "Letter of Understanding"

---

[16] Id. at *4 (citations omitted).

[17] Id.

[18] 326 Ga. App. 350 (756 SE2d 585) (2014) (physical precedent only).

[19] Id. at 354 (1) (a).

[20] Id.

that addressed his anticipated resignation. In the trial court's view, the limitation period likely began in June, but commenced no later than August 2009.

Again, we disagree. Both *Stokes* and *Tuttle* are distinguishable from the situation here.[21] The claimants in those cases received notice explaining an upcoming adverse employment action. The statute of limitation commenced at that point – when the plaintiffs learned that their employers had made a definitive decision to take adverse action against them.

In contrast, there is no evidence that Albers was informed before November 19, 2009, that he was actually being terminated. Undoubtedly, the defendants had threatened termination during the summer, and Albers suspected that his employment would be ending. He also believed that the defendants were retaliating against him. But he was not terminated at that point.[22] And although the defendants asked Albers to sign a Letter of Understanding in August 2009 through which the parties would

---

[21] We note that neither *Stokes*, which is a federal decision, nor *Tuttle*, which is physical precedent only, are binding on this court. See Court of Appeals Rule 33 (a); *Baskin v. Ga. Dept. of Corr.*, 272 Ga. App. 355, 359 (3) (612 SE2d 565) (2005) ("Decisions of federal courts are not binding authority on this court, but their reasoning may be persuasive.").

[22] Although other adverse actions were arguably taken against Albers – such as stripping him of his duties as police chief – he does not allege a retaliation claim based on these actions. He complains only that he was wrongfully terminated.

have agreed to a December 2009 end-date for his employment, Albers refused to enter the agreement, and he rejected all efforts to secure his resignation. Finally, despite the dissent's assertion that there was no evidence that Carruth's decision communicated to Albers on June 25, 2009 was less than final, the HR director testified that the defendants did not make a final termination decision until "right before [Albers] was actually terminated" via the November 19, 2009 letter.

As we noted in *Tuttle*, "the true test to determine when a cause of action accrued is to ascertain the time when the plaintiff could first have maintained his action to a successful result."[23] Prior to November 19, 2009, Albers had not been terminated or provided with any definitive statement that he would be terminated as of a certain date. He did not resign, he refused to sign the Letter of Understanding regarding his employment status, and he continued to work at GPC. The situation was in flux, and, according to the HR director, no final decision was made until just before Carruth issued the termination letter. Given these circumstances, at least some evidence shows that the alleged retaliation about which Albers now complains – his termination from GPC – had not yet occurred and thus could not have been

---

[23] *Tuttle*, supra at 353 (citation and punctuation omitted).

discovered before November 19, 2009.[24] The trial court, therefore, erred in granting summary judgment to the defendants on their statute of limitation defense.

*Judgment reversed. Barnes, P.J., and McFadden, J., concur. Ray, J., concurs in Division 1 and concurs in judgment only as to Division 2. Andrews, P.J., Ellington, P.J., and McMillian, J., dissent.*

---

[24] See OCGA § 45-1-4 (e) (1); see also *Orquiola v. Nat. City Mortg. Co.*, 510 FSupp2d 1134, 1152 (N.D. Ga. 2006) ("[N]umerous courts have concluded that verbal reprimands and threats of termination do not constitute adverse employment actions.") (citation and punctuation omitted).

A14A1220. ALBERS v. GEORGIA BOARD OF REGENTS OF
    THE UNIVERSITY SYSTEM OF GEORGIA et al.

ELLINGTON, Presiding Judge, dissenting.

In my view, the trial court correctly ruled in this case that Albers failed to file his claim for wrongful termination within the time allowed. Accordingly, I respectfully dissent.

OCGA § 45-1-4 (e) (1) provides:

> A public employee who has been the object of retaliation in violation of this Code section may institute a civil action in superior court for relief . . . within one year after discovering the retaliation or within three years after the retaliation, whichever is earlier.

Under Georgia law, "when the question is raised as to whether an action is barred by a statute of limitation, the true test to determine when the cause of action accrued is to ascertain the time when the plaintiff could first have maintained his action to a

successful result." (Citation and punctuation omitted.) *Sandy Springs Toyota v. Classic Cadillac Atlanta Corp.*, 269 Ga. App. 470, 471 (1) (604 SE2d 303) (2004). Accordingly, as we held in another whistle-blower case, a public employee's cause of action accrued and the one-year limitation period began to run on the date when the employee first discovered the retaliation in question, in that case, when he was advised that his position was to be eliminated. *Tuttle v. Bd. of Regents of the Univ. Sys. of Ga.*, 326 Ga. App. 350, 353-354 (1) (756 SE2d 585) (2014) (physical precedent only) (period was not tolled until the employer's former supervisor advised him that employer had retaliated against him).[1]

In this case, Albers testified that he was aware that his employment was being terminated when his immediate supervisor, Ron Carruth, told him on June 25, 2009, that he needed to resign or be terminated. Further, Albers testified that, from that date, he believed "[he] was being terminated unjustly and without cause" and *"in retaliat[ion] against . . . uphold[ing] the law."* (Emphasis added.) He began to take action to protect his interests in anticipation of potential litigation, including secretly

---

[1] See also *Stokes v. Savannah State Univ.*, 291 Fed. Appx. 931, 932 (11th Cir. 2008) (employee discovered retaliation on the date he received his supervisor's letter of termination, or at the latest on the date the president of the university affirmed the decision to terminate).

2

tape-recording meetings with his supervisors and other college officials. Although the record shows that Carruth did not memorialize his decision in writing until the November 19, 2009 letter cited by the majority, Albers failed to identify any evidence that Carruth's decision, communicated on June 25, 2009, was less than final. Significantly, within a week or two of this communication, Albers surrendered his badge, gun, and official vehicle, stopped reporting to his office, and stopped carrying out the duties of the chief of police. Thus, although Carruth left open for some months the issues of the formal mechanism of Albers' separation (voluntary resignation versus involuntary termination) and the last day he would be on the payroll, it is undisputed that Albers discovered the alleged retaliation by June 25, 2009. Accordingly, his complaint, filed on November 10, 2010, was filed outside the one-year statutory limit. *Tuttle v. Bd. of Regents of the Univ. Sys. of Ga.*, 326 Ga. App. at 354-355 (1) (physical precedent only).

For these reasons, I would affirm the ruling of the trial court.

I am authorized to state that Presiding Judge Andrews and Judge McMillian join in this dissent.

3