**SECOND DIVISION**
**MILLER, P. J.,**
**HODGES and PIPKIN, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**June 29, 2021**

# In the Court of Appeals of Georgia

A21A0361. BAPTISTE v. DEKALB COUNTY SHERIFF, JEFFREY L. MANN, IN HIS OFFICIAL CAPACITY.

MILLER, Presiding Judge.

Anton I. Baptiste, plaintiff in the wrongful-termination case below, appeals from the trial court's grant of summary judgment to the defendant, DeKalb County Sheriff Jeffrey L. Mann, in his official capacity. In five enumerations of error, Baptiste argues that the trial court erred in granting summary judgment to Mann because he presented a prima facie case of retaliation in violation of the Georgia Whistleblower Act and carried his burden of presenting evidence that Sheriff Mann's stated reason for terminating him was pretextual. We agree and therefore reverse the trial court's grant of summary judgment.

> Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA §

9-11-56 (c). A de novo standard of review applies to an appeal from a grant of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant.

(Footnote omitted.) *Caldon v. Bd. of Regents of the Univ. Sys. of Ga.*, 311 Ga. App. 155 (715 S.E.2d 487) (2011).

So viewed, the record shows that in the spring of 2014, Jeffrey Mann, a chief deputy for the Dekalb County Sheriff's Office, was campaigning for the July 22, 2014 Dekalb County Sheriff's election. Baptiste worked in various positions at the DeKalb County Sheriff's Office from 2001 until his termination on July 24, 2014. He served as an investigator in the Office of Professional Standards ("OPS") from 2003 to 2012 and as a sergeant in the Jail Division from 2012 to 2014.

On January 30, 2014, Baptiste was the supervisor on duty when Detention Officer Anthony Dozier used excessive force against inmate Joseph Sims ("Dozier/Sims Incident"). Baptiste prepared a written statement, as per the proper procedure, and he also reported the incident directly to the Assistant Commander of OPS, Lieutenant Christopher Patterson. According to Patterson, Baptiste was concerned the Jail Division would attempt to shield Officer Dozier from criminal

prosecution. Patterson assigned OPS Investigator Rodney Scandrett to investigate the Dozier/Sims Incident.

Shortly thereafter, on February 10, 2014, Baptiste's supervisor, Captain Roderick Morgan, prepared a written counseling disciplinary action recommendation form against Baptiste for the Dozier/Sims Incident. On the form, Morgan alleged that Baptiste was guilty of neglect of duty for failing to remove Dozier from the scene. Additionally, according to Baptiste, after he contacted Patterson, Morgan told him that he should never contact OPS about anything that happens in the jail, because "[w]e're going to take care of our own in the jail."

Baptist then prepared a rebuttal memo. In the memo, Baptiste recounted the events of the Dozier/Sims Incident and explained why he disagreed with Morgan's assertion that he failed to take appropriate supervisory action. Baptiste also stated that he had contacted OPS to advise them of the use of force violation. In addition, Baptiste discussed two previous use of force incidents at the jail, alleging that those scenes were far greater examples of sergeants failing to supervise their subordinate officers, and asserting that the incidents had not been properly reported and that the individuals had not been appropriately disciplined. He suggested that, in questionable

3

use of force incidents, the Sheriff's Office should consider obtaining "assistance from [an] outside entity that specializes in civil rights violations."

In May 2014, Patterson followed up with Investigator Scandrett and learned that he had not conducted any investigation at all into the Dozier/Sims Incident. Patterson then contacted Morgan and asked about the status of the Jail Division's use of force package on the Dozier/Sims Incident.[1] Morgan responded that the Jail Division would "handle it on [its] own." During the same time period, Investigator Scandrett repeatedly told Patterson, "[T]hey will take care of you and Baptiste after the election." Patterson understood these statements to mean that, once Mann was elected as Sheriff, the Sheriff's Office command staff would target Patterson and Baptiste for their efforts to seek accountability for the use of force complaints in the Jail Division.

In May 2014, Baptiste met with Xernia Fortson, the chief of administration of the Dekalb County Sheriff's Office, and told her that civil rights violations were occurring in the jail and that they were not being referred to the District Attorney for

---

[1] After a use of force incident, the Jail Division compiles reports from the officer involved, the officer's supervisor, any witnesses, and any available photographs and videos into a package and forwards it to OPS.

possible prosecution. According to Fortson, she was "completely unfamiliar with" the things Baptiste was discussing. Following the meeting, Fortson called Patterson and told him that Baptiste had reported to her that civil rights violations were occurring at the jail and not being referred to the District Attorney. Fortson asked Patterson if Baptiste had reported such violations to him, and Patterson confirmed that Baptiste had made such reports.

In June or July 2014, a former Sheriff's Office employee told Baptiste that two doctors had resigned because Fortson told them to recycle inmate medication by giving medicine prescribed to one inmate to another inmate. On July 8, 2014, Baptiste contacted Dr. William Brickhouse, the Mental Health Director for the vendor that supplies counseling services at the jail, and asked if he was aware of any medication being recycled and whether he knew the names of the doctors who had resigned. Brickhouse found the call to be an inappropriate "political solicitation" because Baptiste seemed to be "fishing for dirt" on Fortson and Mann, who was campaigning for Sheriff, and Baptiste mentioned a desire to "stop th[e] reign of terror" by Fortson and Mann. Brickhouse prepared a written report of the phone call and sent it to Baptiste's supervisors.

Baptiste's supervisors subsequently questioned him about his conversation with Brickhouse. Specifically, Baptiste was asked whether he spoke with any sworn, non-sworn, or civilian personnel to obtain negative information about command staff. Baptiste denied doing so. Morgan, however, concluded that Baptiste had violated the office's policies against public criticism of the office and for truthfulness/cooperation, and he recommended that Baptiste be disciplined immediately. Chief Deputy Reginald Scandrett, a commander in the Jail Division, asked Baptiste why he had contacted Brickhouse and whether he had used the phrase "reign of terror." Baptiste was evasive but ultimately admitted that he was conducting an investigation and that he had used the phrase.

The sheriff's election was held on July 22, 2014. Baptiste was terminated two days later, and, three days later, Patterson was demoted and transferred out of OPS. Ultimately, it was Sheriff Mann who decided to terminate Baptiste, but both Fortson and Chief Scandrett agreed with the decision.

Baptiste filed the instant suit against Sheriff Mann in his official capacity, alleging that his termination violated the Georgia Whistleblower Act ("GWA") and asserting a claim for attorney fees. Mann moved for summary judgment, arguing that no genuine issue of material fact remained on Baptiste's claim because (1) Baptiste's

reports of excessive use of force and the alleged medication recycling were not "disclosures" within the meaning of the GWA; (2) the alleged disclosures were not causally connected to Baptiste's termination; (3) Baptiste's violation of the office's policies on public criticism and truthfulness/cooperation was a legitimate non-discriminatory reason for Baptiste's termination; and (4) Baptiste could not show that the proffered reason for his termination was pretextual.[2] The trial court granted the motion after a hearing, and Baptiste filed this appeal.

The Georgia Whistleblower Act, OCGA § 45-1-1 *et seq.,* prohibits a public employer from retaliating "against a public employee for disclosing a violation of or noncompliance with a law, rule, or regulation to either a supervisor or a government agency, unless the disclosure was made with knowledge that the disclosure was false or with reckless disregard for its truth or falsity." OCGA § 45-1-4 (d) (2). To succeed on a claim under the GWA, a public employee must establish "that (1) [he] was employed by a public employer; (2) [he] made a protected disclosure or objection; (3) [he] suffered an adverse employment action; and (4) there is some causal relationship between the protected activity and the adverse employment action."

---

[2] Mann also argued that Baptiste was not a "public employee," but he later conceded at the hearing for the summary judgment motion that Baptiste was a "public employee" for purposes of the GWA.

*Murray-Obertein v. Ga. Govt. Transparency and Campaign Finance Comm.*, 344 Ga. App. 677, 680-681 (812 SE2d 28) (2018).

> When analyzing claims brought under the Georgia Whistleblower Act, we apply the same burden-shifting analysis established by the United States Supreme Court for retaliation cases brought under Title VII of the Civil Rights Act of 1964. See *McDonnell Douglas Corp. v. Green*, 411 U. S. 792, 802-803 (II) (93 SCt 1817, 36 LE2d 668) (1973). Under this framework, the plaintiff must first make a prima facie case of retaliation. If the plaintiff makes a prima facie case, the burden of production shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employment decision. If the employer successfully meets this burden of production, then the burden shifts back to the plaintiff to show that each proffered reason was pretext.

(Citations and punctuation omitted.) *Franklin v. Pitts*, 349 Ga. App. 544, 547 (826 SE2d 427) (2019). When analyzing cases under the *McDonnell Douglas* framework, we have previously relied on, and found persuasive, cases from the Eleventh Circuit. *Tuohy v. City of Atlanta*, 331 Ga. App. 846, 851 (3) (a) n.6 (771 SE2d 501) (2015).

In this case, the trial court concluded that Baptiste failed to establish a prima facie case of retaliation in violation of the GWA. Sheriff Mann conceded that Baptiste is a public employee, and there is no dispute that Baptiste suffered an adverse employment action. Our focus, therefore, is on the second and fourth elements:

8

whether Baptiste engaged in a protected activity, and whether there is a causal link between that protected activity and the adverse employment action.

1. As to protected activities, the trial court found that Baptiste's call to OPS regarding the Dozier/Sims Incident was a protected disclosure pursuant to the GWA. On appeal, Baptiste argues that he made at least two additional protected disclosures.

*(a) Rebuttal Memo*

Baptiste first contends that his rebuttal memo was a protected disclosure because it described previous incidents of excessive force and alleged that the Sheriff's Office was obstructing justice by failing to hold the officers accountable. We note that the record includes evidence establishing that, under the Sheriff's Office's policies and procedures, whenever force is used against an inmate, the officers involved and their supervisor are required to write a statement, and those statements and any other relevant evidence are to be assembled in a use of force package, which will then be forwarded up the chain of command and possibly referred to OPS. If an investigation reveals criminal activity by an officer, OPS forwards its findings to the District Attorney for possible prosecution. In addition, whenever there is an injury to an inmate, a preliminary report must be delivered to the Sheriff and OPS within twenty-four hours.

In his rebuttal memo, Baptiste asserted that in a previous incident of excessive force, an officer struck a suspect (who was handcuffed, secured in leg irons, and wearing a seat belt) numerous times, rendering him unconscious and causing a crushed trachea. Supervisors failed to respond to the scene, the supervisor who cleaned the bloody vehicle where the incident occurred did not photograph it first, and no supervisor ever interviewed any witnesses. Nonetheless, all supervisors were eventually promoted. Baptiste asserted that in another previous incident of excessive force, an officer repeatedly slapped an inmate (who was handcuffed and seated) in the face. No witnesses were interviewed, and no use of force report was generated until the case was reported to OPS. Baptiste maintained that both incidents were clear violations of an inmate's civil rights and were far more serious situations of neglect of duty, yet the Sheriff's Office failed to take the "necessary required action" after those incidents.

As we noted above, the GWA protects public employees from retaliation for "disclosing a violation of or noncompliance with a law, rule, or regulation to either a supervisor or a government agency[.]" OCGA § 45-1-4 (d) (2). If the violation or noncompliance is already widely known, however, the employee's disclosure of it does not constitute whistleblowing and is not protected by the GWA. See *Forrester*

*v. Ga. Dep't of Human Servs.*, 308 Ga. App. 716, 724 (1) (a) (ii) (708 SE2d 660) (2011) (physical precedent only). In *Forrester*, the plaintiffs contended that they were fired in retaliation for reporting a coworker's chronic absenteeism and drug abuse. *Forrester*, supra, 308 Ga. App. at 724 (1) (a) (ii). The coworker's absenteeism and excuses were already a "running joke" that was discussed in the office on a daily basis, however, so we concluded that the plaintiffs' disclosures were not covered by the GWA. Id.

Here, considering the Rebuttal Memo in its entirety and in the light most favorable to Baptiste, we agree with Baptiste that the memo not only identified previous incidents of excessive force and lack of supervision, but also alleged that the Sheriff's Office was failing to take required measures to address the incidents, including compiling a use of force package and referring serious incidents to OPS for possible referral to the District Attorney for criminal prosecution. And although the incidents themselves may have been firmly documented, the Sheriff's Office's alleged lack of appropriate responses was not. Consequently, we conclude that the Rebuttal Memo contained protected disclosures within the meaning of the GWA.

*(b) Meeting with Chief Fortson*

11

Second, Baptiste contends that he made protected disclosures during his meeting with Chief Fortson in May 2014, when he reported both violations of inmates' civil rights and the Jail Division's efforts to avoid criminal prosecution for the individuals involved in them. According to Baptiste, during this meeting he advised Fortson that a number of civil rights violations had occurred in the jail. At her deposition, Fortson stated that she did not recall exactly what Baptiste told her, but she remembered that he talked about situations that had happened in the jail with which she was completely unfamiliar. Patterson stated, however, that right after the meeting, Fortson told him Baptiste had informed her that civil rights violations were occurring at the jail but were not being referred to the District Attorney for possible prosecution, and that she asked Patterson if Baptiste had made similar reports to OPS.

The trial court concluded that the complaints Baptiste raised during his meeting with Fortson, like those he identified in the memo, did not constitute protected disclosures because they were already widely known. Fortson, however, testified that she was unaware of the issues Baptiste disclosed to her during their meeting. And again, although the incidents themselves may have been well-documented, there does not appear to be any evidence that the Sheriff's Office's alleged lack of appropriate responses was widely known. Accordingly, we conclude that Baptiste's May 2014

12

meeting with Fortson constitutes a protected disclosure within the meaning of the GWA.

2. Next, Baptiste argues that the trial court erred by granting summary judgment to Mann on his GWA claim because genuine issues of fact remain as to whether there was a causal connection between his disclosures and his termination. We agree and conclude that the trial court erred by granting summary judgment on this basis.

As to causation, we have stated that

> [t]he causal link element is construed broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated. A plaintiff satisfies this element if [he] provides sufficient evidence of [(1)] knowledge of the protected expression and [(2)] that there was a close temporal proximity between this awareness and the adverse action.

(Citations and punctuation omitted.) *Freeman v. Smith*, 324 Ga. App. 426, 431 (1) (750 SE2d 739) (2013) (overruled on other grounds by *Franklin v. Pitts*, 349 Ga. App. 544, 552 (1) (c) (826 SE2d 427) (2019)).

When considering whether a plaintiff has satisfied the causal connection element of a GWA claim, appellate courts have recognized that, as a general rule, the

13

passage of time between the protected activity and the adverse action tends to negate an inference of discrimination. See, e.g., *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-274 (121 SCt 1508, 149 LE2d 509) (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close[.]' Action taken (as here) 20 months later suggests, by itself, no causality at all.") (citations omitted); *Albers v. Ga. Bd. of Regents of the Univ. Sys. of Ga.*, 330 Ga. App. 58, 62-63 (1) (b) (766 SE2d 520) (2014) ("It is true that timing may be important in the causation analysis. As we have noted, a retaliation claim fails if there is a substantial delay between the protected expression and the adverse action in the absence of other evidence tending to show causation.") (Footnote and punctuation omitted). "Where there was a significant time gap between the protected activity and the adverse action, the plaintiff must offer additional evidence to demonstrate a causal connection, such as a pattern of antagonism or that the adverse action was the first opportunity for the employer to retaliate." *Ward v. UPS*, 580 Fed. Appx. 735, 739 (II) (B) (11th Cir. 2014).

*(a) Defendant's Knowledge of the Protected Disclosures*

14

Baptiste contends there is circumstantial evidence that Mann knew of his disclosure to OPS before the written counseling was issued on February 10, 2014. He notes that OPS Investigator Scandrett, who was assigned to investigate the Dozier/Sims incident, is Chief Scandrett's cousin, and both Morgan and Chief Scandrett testified that it is possible Chief Scandrett directed Morgan to issue the written counseling. Baptiste asserts that, in light of this evidence, it could be inferred that Chief Scandrett learned of Baptiste's disclosure to OPS through his cousin, OPS Investigator Scandrett, and then directed Morgan to discipline Baptiste.

Baptiste also notes that both Fortson and Chief Scandrett reviewed his Rebuttal Memo, and he met with Fortson in late May 2014. Both Fortson and Chief Scandrett recommended that Baptiste be terminated, and their recommendations were factors in Mann's decision to terminate Baptiste. Further, Mann was aware of Baptiste's written counseling form and that Baptiste had filed open records requests for use of force incidents even though he would not typically be aware of such issues. In light of these facts, we agree with Baptiste that, viewing the evidence in his favor, a reasonable jury could conclude that Mann knew of the disclosures before he terminated Baptiste.

15

*(b) Temporal Relationship Between Protected Disclosures and Termination*

Baptiste made his last disclosures when he met with Fortson in May 2014, and he was terminated on July 24, 2014. This span of approximately two months was sufficiently close in time to satisfy the requirement that there be a close temporal proximity between the protected disclosure and the adverse action. See *Jones v. Bd. of Regents of the Univ. Sys. of Ga.*, 262 Ga. App. 75, 81 (4) (585 SE2d 138) (2003) (where plaintiff's investigation ended in late January and he was dismissed on March 12, the temporal relationship of approximately two months constituted circumstantial evidence that plaintiff was dismissed in reprisal for his investigation).

Also, Baptiste has presented evidence tending to explain the months-long delay between his first and second protected disclosures and his termination – specifically, that Mann was campaigning in a contested election for the Sheriff's position until July 22. As evidence in this vein, Fortson testified that in early 2014, the Sheriff's Office was in an atypical "vacuum" because of the upcoming sheriff's election. The sheriff of fourteen years was stepping down, and Mann, the chief deputy, was seeking to replace him. As Fortson explained, the office was "a big ship," and although a lot of its policies and procedures stayed the same, "it was unknown to us to have a new sheriff and a vacuum and no chief at the time." Further, there is evidence that, during

16

the campaign period, the jail division's command staff was planning to "take care" of Baptiste after the election.

Mann argues that Baptiste's call to Brickhouse broke any causal chain between his protected disclosures and his termination, and he cites federal caselaw for the principle that where a plaintiff engages in an intervening act of misconduct, that act can break the causal connection between his protected activity and the adverse employment action. See *Brisk v. Shoreline Found., Inc.*, 654 Fed. Appx. 415, 417 (11th Cir. 2016) ("there was no causal connection between the protected conduct–[the plaintiff] taking FMLA leave--and the adverse event, termination, when the temporal proximity of four months was tenuous and there was an intervening cause of poor work performance"); *Hankins v. AirTran Airways, Inc.*, 237 Fed. App'x. 513, 520 (11th Cir. 2007) ("Despite a close proximity in time between the [protected complaint and plaintiff's termination], the evidence establishes that [the plaintiff's] flagrant act of misconduct[, yelling at a co-worker and threatening to "kick his ass,"] broke the causal chain."). Even in those cases, however, the court considered not only whether the plaintiff had engaged in an intervening act of misconduct, but also other indicia of causation, including the strength of the temporal relationship between the protected activity and the adverse employment decision. Thus, to the extent Mann contends that

17

an intervening act of misconduct automatically severs an apparent causal connection, we reject his argument. We further conclude, at least under the circumstances presented in the instant case, that the question of whether Baptiste's alleged acts of misconduct were the cause of his termination is more appropriately considered at the pretext stage than as part of the prima facie case.

We also reject Mann's contention that the doctrine of first opportunity retaliation cannot apply to this case. Mann bases his argument on the fact that neither Baptiste nor Mann were absent from work during the relevant period, and he also notes that there was no change in leadership at the Sheriff's Office during that time. But we do not read such a requirement in this doctrine. Instead, we view this theory as part of the overall question of whether there is sufficient evidence of causation. See, e.g., *Ward*, supra, 580 Fed. Appx. at 739 (II) (B)("Where there was a significant time gap between the protected activity and the adverse action, the plaintiff must offer additional evidence to demonstrate a causal connection, such as a pattern of antagonism or that the adverse action was the first opportunity for the employer to retaliate."). Additionally, we are mindful that, on the issue of causation, the plaintiff need only establish that the protected activity and adverse action were not completely unrelated. See *Albers*, supra, 330 Ga. App. at 62 (1) (b) ("The causation element in

18

a whistleblower case is construed broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.") (Footnote and punctuation omitted). Here, although neither Mann nor Baptiste were absent during the relevant time period, there is evidence that there was a "vacuum" of leadership at the Sheriff's Office between Baptiste's earliest disclosures and the sheriff's election. Further, there is evidence that, during the campaign period, the jail division's command staff was planning to "take care" of Baptiste after the election. And Baptiste was, indeed, terminated only two days after the election.

Ultimately, under the circumstances presented in this case, we conclude that a reasonable juror could find that Baptiste has established prima facie evidence of causation between his protected disclosures and subsequent termination, and we therefore conclude that the trial court erred by granting summary judgment on this basis.

3. Lastly, Baptiste argues that the trial court erred in granting summary judgment to Mann because genuine issues of fact remain as to whether the proffered reason for his termination was a pretext for retaliation. We agree and conclude that the trial court erred by granting summary judgment on this basis.

Under the *McDonnell-Douglas* framework, Mann bears the burden of articulating a legitimate, non-retaliatory reason for terminating Baptiste. See *Franklin*, supra, 349 Ga. App. at 547; *Harris v. City of Atlanta*, 345 Ga. App. 375, 377 (813 SE2d 420) (2018). The burden then shifts back to Baptiste to show that the proffered reason was a pretext for retaliation. Id. Here, Mann contends that Baptiste was terminated because he violated the office's policies against public criticism and for truthfulness/cooperation based on his conversation with Dr. Brickhouse and his evasiveness when asked about that conversation.[3] Assuming that Mann has met his burden of articulating a legitimate, non-retaliatory reason for the termination, the burden now shifts to Baptiste to establish that Mann's proffered reason is pretextual. We have said that

> [p]retext is established by a direct showing that a discriminatory reason more likely motivated the defendant or by an indirect showing that the

---

[3] The DeKalb County Sheriff's Office Code of Conduct provides that "[p]ublic criticism of the DKSO, its policies or members by talking, writing, or expression in any manner where such talking, writing, or expression: is defamatory; is obscene; is unlawful; tends to impair the operation of the DKSO by impairing its efficiency; interferes with the ability of supervisors to maintain discipline; or is made with reckless disregard for truth or falsity, is prohibited." As to truthfulness/cooperation, the code of conduct provides: "[t]estifying, falsifying any document, making reports or conducting business in a less than truthful and/or cooperative manner is prohibited."

defendant's explanation is not credible. To avoid summary judgment, a plaintiff must present significantly probative evidence on the issue of pretext because the plaintiff has the burden of establishing pretext. A defendant's given reason is not pretextual unless it is shown both that the reason was false, and that discrimination or retaliation was the real reason. If the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason, or showing that the decision was based on erroneous facts.

(Footnotes and punctuation omitted..) *Harris*, supra, 345 Ga. App. at 378-379 (2) (b).

We conclude that Baptiste has carried his burden in this case. Among other evidence, Baptiste showed that, under the office's schedule of penalties, a first violation of the truthfulness/cooperation policy ordinarily would result in a 25.5-hour suspension without pay while a first violation of the Public Criticism policy would result in an 8.5-hour suspension without pay. Baptiste had no prior disciplinary history in his fourteen year tenure at the Sheriff's Office, except for the written counseling he received after the Dozier/Sims Incident, but he was nonetheless terminated in light of his first violations. Baptiste also showed that another employee, Officer Dozier, was subject to less severe discipline for more severe infractions of the Code of Conduct: Dozier was involved in a second excessive-force incident less than

21

five months after the Dozier/Sims incident, but Sheriff Mann decided to demote, rather than terminate, him. Finally, Baptiste presented evidence suggesting that Mann and jail division leaders were planning to retaliate against him and Patterson. Specifically, when Patterson inquired about the Jail Division's investigation into the Dozier/Sims incident, he was told that the Jail Division would handle the situation on its own and that the Sheriff's Office planned to "take care" of him and Baptiste after Mann's election. Considering this evidence in the light most favorable to Baptiste, we conclude that a reasonable juror could find that Mann's stated reason for terminating Baptiste was pretextual and that Baptiste was terminated in retaliation for making disclosures about the Sheriff's Office. See *Jefferson v. Sewon America, Inc.*, 891 F.3d 911, 925-926 (III) (C) (3) (11th Cir. 2018) (to determine whether a reasonable jury could find that the employer's stated explanation for the plaintiff's termination was a pretext for retaliation, the court must consider "all the circumstances together," including the timing of the termination and whether the employer followed its discipline policy when it decided to terminate the plaintiff).

Accordingly, for the reasons stated above, we reverse the trial court's grant of summary judgment.

*Judgment reversed. Hodges and Pipkin, JJ., concur.*

22